**UNITED STATES of America**

v.

**Francis Clayton PALMER, Defendant.**

**Crim. No. 90–040–S–HLR.**

United States District Court,
D. Idaho.

Tentative Findings of Fact
March 22, 1991.

Final Findings of Fact and
Statement of Reasons March 28, 1991.

---

Maurice O. Ellsworth, U.S. Atty., Monte Stiles, Asst. U.S. Atty., D. of Idaho, Boise, Idaho, for the Government.

Philip H. Gordon, Sallaz, Doolittle & Gordon, Chartered, Boise, Idaho, for Francis Clayton Palmer.

### TENTATIVE FINDINGS OF FACT

RYAN, Chief Judge.

Pursuant to Section 6A1.3(b) of the United States Sentencing Guidelines, and Rule 32 of the Federal Rules of Criminal Procedure, the court hereby submits the following "tentative findings" related to disputed sentencing factors. The parties are hereby advised that they shall, on or before, 4:00 p.m. on Monday, March 25, 1991, file with the court any written objections to these findings.

A jury having previously found the defendant, FRANCIS CLAYTON PALMER, guilty of the charges contained in a two-count Indictment which included a violation of Title 21, United States Code § 846 (Conspiracy to Manufacture and Distribute Methamphetamine), and a violation of Title 21, United States Code § 841(a)(1) (Distribution of Methamphetamine), the court is satisfied that the defendant is guilty as charged therein. The court's "tentative findings" are as follows:

On February 12, 1991, a presentence investigation report was prepared pursuant to Rule 32, Federal Rules of Criminal Procedure. Thereafter, counsel for each party had an opportunity to submit written objections to the presentence report, which both parties did. The Probation Officer revised the presentence report on March 1, 1991, and also submitted an addendum to the report on that date. The government filed a sentencing memorandum on March 6, 1991, and the defendant filed his sentencing memorandum on March 18, 1991.

Under Rule 32, the court is required to enter findings as to any alleged *factual* inaccuracies in the presentence investigation report *or* to make a determination that no such findings are necessary because the controverted matter will not be taken into account in sentencing.

### I. GOVERNMENT'S OBJECTIONS

On February 22, 1991, the government filed with the United States Probation Office an eight-page memorandum in which it makes basically four objections to the presentence report. The government argues that: (1) certain information should be added to the "offense conduct summary" as set forth in paragraphs 7–36; (2) the two-level enhancement for obstruction of justice should apply; (3) the report should contain more information about the defendant's "other criminal conduct"; and (4) the base offense level of 34 should be corrected to reflect a base offense level of 38. After the Probation Officer prepared the revised report and addendum, the government, on March 6, 1991, filed a sentencing memorandum in which the government details its argument as to the correct base offense level. The court will attempt to address all of the government's arguments.

### A. *Offense Conduct Summary*

The government argues that additional information concerning the object offense and related conduct should be added to "The Offense Conduct" section of the presentence report to more accurately reflect the offense conduct. Specifically, the government argues that in paragraphs 8, 12, 13, 14, 16, 17, 19, 22, 23, 26, 29, and 36, the report should contain additional information which the government has delineated in its objections.

The court has reviewed this information and without going into detail concerning each paragraph, finds that further elaboration on paragraphs 7 through 35 would not benefit the court in arriving at an accurate and appropriate guidelines range for the sentencing of this defendant. The court is well aware of the facts that encompass this criminal conspiracy, and will not require the Probation Department to include every detail that the government feels has some relevance. Therefore, the court will not make factual findings concerning the additional information presented by the government and will ADOPT paragraphs 7 through 35 of the revised report as its own. As to paragraph 36, which relates to the

quantity of drugs involved in this case, this issue will be addressed below under the base offense level objection.

### B. *Obstruction of Justice*

■ The government has also objected to paragraph 38 of the report to the extent that it does not give the defendant a two-point enhancement for the obstruction of justice. The government argues that the facts related to the trial in this matter, along with the defendant's testimony in the related cocaine trial, clearly warrant the imposition of this enhancement.

Section 3C1.1 of the guidelines provides for a two-level enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense...." United States Sentencing Commission, *Guidelines Manual*, § 3C1.1 (Nov.1990). The Application Notes to this section indicate that this adjustment is not intended to apply as a punishment for a defendant who exercises his constitutional rights. U.S.S.G. § 3C1.1, comment. (n. 1). This note also states that the court should evaluate the defendant's testimony or statements in the light most favorable to the defendant. Id. This enhancement is also not intended to apply to the situation where the defendant denies that he is guilty, unless that denial of guilt constitutes perjury. U.S.S.G. § 3C1.1, comment. (n. 1 and 3(b)).

The government argues that the defendant has impeded or obstructed justice by asserting two inconsistent defenses in the two related trials. The government argues that in the cocaine trial, the defendant testified that he was forced to sell the cocaine to Agent Dunne because he feared for his life and the life of his son. The government then argues that in this trial, the defendant presented the defense that he was only conspiring with the other defendants to steal from Agent Dunne. The government concludes that these actions by the defendant clearly show an attempt to obstruct and impede justice. In addition, the government argues that the defendant

has somehow obstructed justice by not informing the government of the nature of his relationship with Shirley Finch until the Probation Officer interviewed him for this report.

The court, considering the factors and the circumstances listed in the Application Notes of Section 3C1.1, and upon review of the entire record, including the revised presentence report and the objections thereto, finds that the defendant has not willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice. The court is unwilling to find that the defendant's defense tactics, at least in this court proceeding, constituted perjury. The court is inclined to agree with the Probation Officer's conclusion: that this objection asserted by the government relates more to the issue of acceptance of responsibility, which is not an issue in this case.

Accordingly, the court ADOPTS paragraphs 38 and 46 of the revised presentence report as its own to the extent they conclude that there should *not* be an adjustment for the obstruction of justice.

### C. *Other Criminal Conduct*

■ The government has also objected to paragraphs 64, 65 and 66 to the extent they fail to include additional information regarding the defendant's past criminal history. The government has not advised the court on why this information is relevant or how it should affect the guidelines calculations. Nor has the government argued that this information should be used by the court to make an upward departure under Section 4A1.3 of the guidelines. The government simply argues that the additional information that it has provided is reflective of the defendant's other criminal conduct. After detailing for the court this "other criminal conduct," which consists mainly of information gleaned from police intelligence reports without any supporting information, the government concludes that:

> [T]he point the Government wishes to make is that Frank Palmer has been known to be heavily involved in the drug trafficking business for some time and

has been identified in a[t] least three different states as being heavily involved. The Government suggests that all of this information, taken together, clearly corroborates the fact that Frank Palmer has been a major drug trafficker. Government's Objections to the Presentence Report, filed Feb. 2, 1991, at 7.

The court finds that the Probation Officer's conclusion related to this additional information is well taken. The majority of the information supplied by the government appears to have been taken solely from police intelligence reports and is not supported by additional information which would make this information more reliable. Without some additional support, such as arrests or charges being brought against the defendant, the court is unwilling to find that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct; therefore, the court will not make an upward departure under Section 4A1.3 and will not require the Probation Officer to add this additional information to the report.

Accordingly, the court hereby ADOPTS paragraphs 64 through 66 of the revised report as its own.

### D. Base Offense Level

The main issue in the sentencing of this defendant is the quantity and purity of the "potential" methamphetamine this criminal conspiracy intended to manufacture and distribute. The government and the defendant have objected to the Probation Officer's conservative estimate that the defendants negotiated and conspired to manufacture and distribute 10–12 pounds of methamphetamine, which under the guidelines results in a base offense level of 34. To avoid duplicity, the court will address both parties' objections under this heading.

#### 1. The government's objection.

The government, in its written objections to the report and through testimony presented during the sentencing hearing, argues that the defendants clearly intended to produce 10–16 pounds of pure, uncut and unadulterated methamphetamine. The government notes that in "no drug" cases, the court is directed by the guidelines to look at two things. First, under Section 2D1.4 of the guidelines, the court should look at the object of the conspiracy. The government argues that the object of this conspiracy, as evidenced by the recorded conversations between the defendants and Agent Dunne, was to produce for the DEA agent anywhere between 10–16 pounds of "pure" or "uncut" methamphetamine. To support this conclusion, the government argued that the defendants had agreed on numerous occasions with the DEA agent not to put a "cook's cut" on the final product, and that the product would therefore be pure and unadulterated.

As additional support for this conclusion, the DEA chemist, Phyllis Quinn, testified at the sentencing hearing that with the 20 pounds of ephedrine and the hydriodic acid that the DEA had supplied these defendants, combined with the recipe found in the defendants' possession at the time of arrest, the defendants could have easily produced 12–16 pounds of pure methamphetamine. This chemist also testified that an 80 percent ratio between the ephedrine supplied and the end product was a very common figure and widely accepted in the scientific and legal community. Application of this ratio to the 20 pounds of ephedrine supplied in this case would result in 16 pounds (or 7.27 kilograms) of methamphetamine. This expert also testified that according to her research, which included an article by Harry Skinner entitled "Methamphetamine Synthesis via Hydriodic Acid/Red Phosphorus Reduction of Ephedrine," introduced into evidence as Government's Exhibit 2, the majority of ephedrine clandestine laboratories will produce a product that is at least 95 percent pure and will have a yield that is somewhere between 50 and 75 percent by weight of the precursor ephedrine. The government argues that based upon this testimony, and the evidence that Co-defendant Luschen was a known and well experienced "cook," these defendants could have produced at least 7.27 kilograms of methamphetamine, and that at least 3 kilograms of that would

be "pure." Therefore, the government argues that the base offense level should be 38.

The government also argues that the court, after evaluating the object of conspiracy, should, pursuant to Application Note 1 of Section 2D1.4, look at the weight under negotiation to calculate the applicable amount. Again the government asserts that the evidence was clear that the defendants negotiated to manufacture 10–16 pounds of pure methamphetamine, and as stated above, the experience of these defendants, the sophisticated recipe that they had, and the chemical amounts they requested, were all consistent with this production level.

Based upon all of the foregoing, the government concludes that even if the defendants would have only been able to convert, say, 60 percent of the ephedrine into methamphetamine resulting in 12 pounds or 5.45 kilograms, and say that only 56 percent of that methamphetamine was "pure," resulting in 3.05 kilograms of "pure" methamphetamine, the base offense level would still be a level of 38 under Section 2D1.1(c)(3). Thus, even in a "worse case" scenario, the government argues the base offense level remains at 38 because the defendant would have produced between 3 and 10 kilograms of "pure" methamphetamine.

2. The defendant's objection.

■ The defendant, on the other hand, takes a totally diametric position. The defendant first objects to the inclusion of any amount of cocaine since he has already been punished for that conduct in Criminal Case No. 90–039–S–EJL. As the Probation Officer notes in his addendum, that even though the cocaine and the .15 grams of methamphetamine distributed by this defendant during the same period of time is clearly "relevant conduct" under Section 1B1.3 of the guidelines, that criminal behavior was severed by Judge Lodge in the January 18, 1991, sentencing. That is to say, that Judge Lodge did not take into account this methamphetamine conspiracy in the prior sentencing. Therefore, it only

follows that this court should not consider the cocaine and .15 grams of methamphetamine as relevant conduct when sentencing the defendant on the conspiracy count as that conduct has already been punished. The court notes that even if it were to include the cocaine and the .15 grams with the 12 pounds of methamphetamine estimated by the Probation Officer, the total amount would still fall within guidelines Section 2D1.1(c)(5) or level 34.

The defendant also argues in his sentencing memorandum and objections to the presentence report that in approximating the amount of methamphetamine, the court must look at certain factors to determine the amount of drugs the defendant was capable of producing. In this case, the defendant argues that the court cannot look at such things as the existence of a real laboratory, the existence of certain chemicals and lab equipment, or the existence of a sum of money, to help it in approximating the amount of drugs involved. The defendant argues that without these factors upon which to base a quantity decision, the court's decision must be solely based upon speculation, conjecture, and "guesstimation."

The defendant questions how the court can determine the actual yield of a phantom lab with any accuracy, when the range of the yield varies from 1 to 92 percent of the weight of the ephedrine, depending upon a whole host of factors. In addition, the defendant questions how the court can determine the purity of this potential methamphetamine when none was seized, and given that a number of factors determine the purity of the end product.

As to the application of the guidelines, the defendant agrees that Section 2D1.4 is the starting point. In this respect, defendant argues that the "object" of this conspiracy was the manufacture of methamphetamine, but not in any particular amount. In applying Application Note 1 to Section 2D1.4, the defendant argues that the defendants were not reasonably capable of producing any quantity of methamphetamine, given that there was no laboratory and given that the DEA had no

intentions of letting these defendants set up a laboratory. The defendant notes that in the language of Application Note 1, the court is allowed to exclude from the negotiated amount, any amount that the court finds that the defendant did not intend to produce *and* was not capable of producing. The defendant argues that reading this note to require a conjunctive finding as to intent and capability, would be inconsistent with the Sentencing Commission's purpose as outlined in the Section 136 of the November 1989 amendment notes. Therefore, the defendant argues that the court can and should exclude from the guideline calculations the weight of the controlled substance under negotiation, as the defendants were clearly not capable of producing such.

The defendant also argues that the defendants were clearly not capable of producing the amount of the drugs for which they had negotiated. The defendant finds it significant to note that the defendant had failed on three prior occasions to deliver the promised amount of drugs that he negotiated with Agent Dunne. The defendant argues that the defendants were not in any way prepared to go and do a "cook" on the day of their arrest. The defendant argues that his due process rights will be violated if the court bases its approximation of the drug quantity solely upon the amount of precursor chemicals and equipment that the DEA has the capability of providing.

Finally, the defendant concludes by asserting that the amount of controlled substances taken into account for the purpose of establishing a base offense level "should be much lower" and, therefore, result in a "much lower" base offense level. Specifically, the defendant requests that the court should err on the side of caution, and adopt the low end estimate of 1 percent of the weight of the ephedrine provided in this case. By the court's calculation, this would be 1 percent of 20 pounds of ephedrine, or approximately 90.72 grams of methamphetamine, which results in a base offense level of 24.

### 3. The court's conclusion.

■ The court has spent a considerable amount of time and resources reviewing the case law presented by the parties, and in researching the issues of quantity and purity. The court finds that this case may be a case of first impression on at least two issues related to the application of the sentencing guidelines. These two issues are as follows: First, of all, the court is faced with a "no drug" case, a case in which the DEA had agreed to supply all the chemicals, all the main laboratory equipment, and the actual place for the defendants to manufacture methamphetamine. In addition, the defendants were arrested shortly after they had taken possession of only two chemicals, ephedrine and hydriodic acid. At the time and place of the arrest, the DEA did not have the other necessary equipment and chemicals to set up this "phantom" or "mythical" laboratory in a manner in which methamphetamine could have been produced, nor did the DEA have any intent of letting the defendants set up a laboratory and commence production. So, one of the main problems the court is faced with is how to factor into the guideline calculations this "mythical lab." In the court's review of the case law, the sentencing court has always been able to point to an "actual" laboratory, whether assembled or disassembled (*United States v. Putney*, 906 F.2d 477 (9th Cir.1990); *United States v. Ono*, 918 F.2d 1462 (9th Cir.1990)), or the court has been able to evaluate the amount of chemicals and equipment that the defendant had in his possession (*United States v. Evans*, 891 F.2d 686 (8th Cir.1989); *United States v. Wagner*, 884 F.2d 1090 (8th Cir.1989); *United States v. Beaulieu*, 900 F.2d 1531 (10th Cir.1990)), or the court has been able to look at the amount of money that the defendant had in his possession (*United States v. Gerante*, 891 F.2d 364 (1st Cir. 1989)). In this case, the court does not have the benefit of these other factors, but instead, this court must simply speculate or guess as to the amount of "potential" methamphetamine that these defendants could produce.

The court finds that, in addition, to the "mythical lab" issue, this also appears to be a case of first impression on the government's "purity" argument. The court is unaware of any case law, and the parties have been unable to point to any case law, that directly deals with the issue of purity. More specifically, the court has been unable to locate any guidance on whether the court should simply guess as to the purity of the methamphetamine that this "mythical" lab could produce, when it has to already speculate as to the amount of methamphetamine that this lab could produce. An approach which requires speculation upon speculation, does not coincide with this court's sense of justice and fairness.

In conspiracy drug cases, that starting point for determining the base offense level is Section 2D1.4 of the guidelines which deals with "Attempts and Conspiracies." This section states that if the defendant is convicted of a controlled substance conspiracy, then "the offense level shall be the same as if the object of the conspiracy ... had been completed." U.S.S.G. § 2D1.4. Because the object of this conspiracy was to manufacture and distribute methamphetamine, the court must determine the quantity of the controlled substance or methamphetamine involved and then base the defendant's sentence in part upon this determination. U.S.S.G. § 2D1.1(a)(3); *United States v. Upshaw*, 918 F.2d 789, 790 (9th Cir.1990). In addition, because this is a "no drug" case, this court must "approximate the quantity of the controlled substance." U.S.S.G. § 2D1.4, comment. (n. 2). However, the problem with this approximation is that the court cannot consider any of the factors listed in Application Note 2 to this section, because these factors do not exist in this case. More specifically, there is no laboratory involved from which the court can consider its size and capability, there are no financial records, and these defendants have not been involved in similar transactions.

Therefore, the court is left with the guidance of Application Note 1 of this section, which provides in part that:

If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the *weight under negotiation* in an uncompleted distribution *shall be used* to calculate the applicable amount. However, where the court finds that the defendant *did not intend to produce and was not reasonably capable of producing* the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce *and* was not reasonably capable of producing.

U.S.S.G. § 2D1.4, comment. (n. 1) (emphasis added).

In addition, the Ninth Circuit in *United States v. Alvarez–Cardenas*, 902 F.2d 734 (9th Cir.1990), in applying this Application Note, has stated that "the offense level for a conspiracy is determined by the amount that the defendant conspired to sell and not by the amount ultimately sold." *Id.* at 736. The court further stated that in a conspiracy it does not matter if the defendant succeeded in doing all he attempted to do. *Id.*

Applying this law to the case at bar, the court finds by a preponderance of the evidence that the object of this conspiracy was not to steal chemicals and cash from Agent Dunne, but was to manufacture and distribute methamphetamine. In approximating the amount of methamphetamine these defendants intended to produce, the court finds it appropriate to base this amount on the quantity that the defendant negotiated with Agent Dunne. It is clear from the record that the defendants anticipated that with the 20 pounds of ephedrine supplied by Agent Dunne, they could manufacture at the very least 10 pounds (4.54 kilograms) of methamphetamine, and that this amount could be as high as 16 pounds (7.27 kilograms). In reviewing the guidelines, the court notes that in Section 2D1.1(c)(5) a base offense level of 34 equates to at least 3 kilograms, but less than 10 kilograms of methamphetamine. Therefore, the court finds that even if it were to adopt the most conservative negotiated amount, 4.54 kilograms, or the most liberal amount, 7.27 kilograms, either of these amounts would

still fall well within the range of 3–10 kilograms for a base offense level of 34.

█ According to the Application Note 1, the court, can reduce the negotiated amount (10–12 pounds) by any amount that the court finds the defendant did not intend to produce *and* was not reasonably capable of producing. The court sincerely questions whether or not these defendants were "reasonably capable" or had the "capacity" to produce any methamphetamine. However, the court has no doubt that the defendants clearly had an intent to produce methamphetamine. Therefore, the court, in reluctantly following the express language of Application Note 1, is unable to exclude from the negotiated amount, any amount that it might otherwise exclude because of the defendant's questionable capability. It is clear from the express language of the application note, that, before this court can reduce the negotiated amount, the court must find that (1) the defendant did not have the intent, *and* (2) that the defendant did not have the capability. It follows then that because the court does not question the defendant's intent to produce the negotiated amount, it cannot and must not reduce the negotiated amount.

Accordingly, the court finds that the Probation Officer was correct in his determination of a base offense level of 34.

█ The only question that remains then, is whether the court should adopt the government's view related to purity. Again, the government argues that the base offense level should be 38, based upon the fact that the defendants negotiated to produce "pure" or "uncut" methamphetamine, and based upon the chemist's testimony that the defendants were indeed capable of producing, at the very least, 3 kilograms of "pure" methamphetamine. The court, however, is unwilling to speculate as to the purity of methamphetamine these defendants *could* produce. The court finds no support in the guideline notes or case law which allows the court to further speculate or hypothesize as to the purity of the "potential" drugs involved in this case. To begin with, we are dealing with a "no drug" case, a "mythical" laboratory, and situation where the DEA had agreed to supply all the chemicals, the majority of the necessary lab equipment, and even the place to do the cook. However, all the DEA actually supplied was two chemicals, the ephedrine and the hydriodic acid. They did not provide the place to cook, or the other necessary chemicals and lab equipment, and in·fact, the DEA had no intentions of letting these defendants set up a laboratory and commence production. All that the defendants agreed to provide was the "cooks" and a recipe.

The court has already had to speculate and approximate in order to determine a quantity of methamphetamine, and the court is simply unwilling to further subjectively conjecture and speculate as to the purity of the "potential" methamphetamine. There appears to this court to be too many factors which could influence the purity outcome of this chemical process, including, but not limited, to the purity of the precursor chemicals, the sophistication of the laboratory equipment, and the experience of the cooks. These factors are sufficiently questionable to preclude this court from increasing the base offense level by four points. The court agrees with the Probation Officer that in this case, given all the facts and circumstances related to this case, the best approach is to be conservative.

Accordingly, The court hereby ADOPTS paragraphs 36, 40, 41, and 42 of the revised presentence report as its own.

## II. DEFENDANT'S OBJECTIONS

On February 26, 1991, the defendant filed with the Probation Department a 15–page memorandum, which contains essentially four objections. The Probation Officer addressed these objections in his revised report dated March 1, 1991, and in the Addendum to the presentence report. It should be noted that the defendant also filed with the court on March 18, 1991, a sentencing memorandum which further details the defendant's objections. The defendant's specific objections to the report are as follows.

**706**

### A. *Upward Departure Pursuant to Section 4A1.3*

The defendant has objected to paragraphs 102 through 104 to the extent they suggest that an upward departure may be warranted. The defendant argues that clearly under the guidelines, certain convictions that are 15 years or older cannot be utilized for upward departure consideration. In addition, the defendant argues that his criminal history is adequately represented by the Probation Officer's assessment, and therefore, no departure is warranted.

As noted above, the court finds that criminal history section of the report does adequately reflect the defendant's past criminal history, and therefore, the court will not consider this information in deciding whether or not to depart upward. Accordingly, the court will ADOPT paragraphs 102 through 104 of the revised presentence report as it own;, however, the court does not find that this information establishes grounds for this court to depart upward.

### B. *The Offense Conduct*

■ Like the government, the defendant has objected to numerous paragraphs in the report that deal with the "Offense Conduct Summary." Specifically, the defendant has objected to the following paragraphs: 8, 27, 28, 29, 32, 33, 34, 35, and 36.

The defendant objected to paragraph 29 to the extent it stated that the DEA agent, on June 7, 1990, brought with him "all" the necessary materials for methamphetamine production. The court notes that the Probation Officer in his revised report has corrected this sentence by deleting the word "all."

As to the remainder of these objections concerning these paragraphs, the court finds that these objections only are an attempt by the defendant to clarify certain facts related to this criminal conspiracy. The court has reviewed this information and, without going into detail concerning each paragraph, finds that further elaboration on the paragraphs that the defendant has addressed would not benefit the court in arriving at an accurate and appropriate guidelines range for the sentencing of this defendant. The court is well aware of the facts that encompass this criminal conspiracy, and will not require the Probation Department to include every detail that the defendant feels has some relevance. Therefore, the court will not make factual findings concerning the additional information presented by the defendant. As stated above, the court ADOPTS paragraphs 7 through 35 of the "Offense Conduct Summary" as its own.

### C. *Enhancement for Leadership Role*

■ The defendant also objects to paragraph 44 to the extent it concludes that the defendant should be assessed a two-level adjustment for being the leader or organizer of the criminal activity pursuant to Section 3B1.1(c) of the guidelines. The defendant argues that he had no ability to lead or supervise, and that he was simply a follower. The defendant argues that he was "hopelessly unorganized," and under no circumstances was he capable of managing or supervising this criminal conspiracy.

The court, after reviewing the entire record, finds that the Probation Officer's evaluation of the defendant's leadership role in this conspiracy is correct. The court finds by a preponderance of the evidence, that the defendant was responsible for the recruiting of the other two co-defendants, and clearly was the individual who set the ground work for this conspiracy by his numerous conversations and drug dealings with Agent Dunne that date back several months before the other defendants became involved. The defendant clearly was the recruiter, the organizer, and the planner of this criminal conspiracy and should be held responsible for such.

Based on the foregoing, the court hereby ADOPTS paragraph 44 of the presentence report to the extent that it finds that the defendant was an organizer or a leader in a criminal activity involving less than five participants and, therefore, should be given a two-level increase pursuant to Section 3B1.1(c) of the guidelines.

## D. *Base Offense Level*

The defendant, as noted above, has also objected to the base offense level established by the presentence report. The court has reviewed these objections and taken them into consideration in making its determination that the appropriate base offense level is 34.

## III. CONCLUSION

The court finds that the base offense level should be 34 with a two-level adjustment for the defendant's role in the offense, pursuant to Section 3B1.1(c). Accordingly, the court finds that the defendant's total offense level should be 36, which, when combined with the defendant's criminal history category of IV, establishes a guideline range of 262 to 327 months.

The court, finding all other noncontroverted facts contained in the presentence report to be true and accurate, hereby ADOPTS the remaining findings contained in the revised presentence report as its own.

## FINAL FINDINGS OF FACT AND STATEMENT OF REASONS

Defendant Francis Clayton Palmer was one of three defendants named in a two-count Superseding Indictment filed in the District of Idaho on August 15, 1990. The Superseding Indictment charged the defendant with conspiracy to manufacture and distribute 100 grams or more of pure methamphetamine, which is a violation of Title 21, United States Code § 846, and with distribution of methamphetamine, a violation of Title 21, United States Code § 841(a)(1). A jury trial was held, and on December 19, 1990, the jury found the defendant guilty on both charges. Thereafter, on March 8 and 26, 1991, a sentencing hearing was held to resolve disputed factual issues that were contained in the presentence report.

After reviewing and considering any and all objections to both the presentence report and to the Tentative Findings of Facts filed on March 22, 1991, the court did not find good cause to modify the tentative findings. The court, therefore, adopted and incorporated the tentative findings into the record as its *FINAL* Findings of Fact as to the objections to the Revised Presentence Report.

In addition, the court clarified one issue. The defendants, in their objections to the court's tentative findings had questioned the court's statement regarding whether these defendants had the capability or capacity to produce any methamphetamine. The court found that the only reason that the court stated that it "sincerely questioned" the defendants' capability or capacity was because of the nature of this "sting" operation and the DEA's failure to produce its part of the agreement; that is, their failure to provide the necessary lab components and materials, whether assembled or not, at the time of the arrest. The court found that the defendants clearly had the intent and/or personal capability to produce methamphetamine; however, they were missing the necessary "tools" to do an actual cook. The court found that that was the only reason it questioned the defendants' capability or capacity. Accordingly, the court incorporated this clarification into its Final Findings of Facts.

The defendant was then sentenced to the custody of the Bureau of Prisons for a term of imprisonment of 261 months on Count I and 262 months on Count II. The court stated that the sentence under Count II was to run concurrently with the sentence in Count I. The court further held that pursuant to U.S.S.G. § 5G1.3, the defendant's sentence under both of these counts was to run consecutively to the January 18, 1991, sentence the defendant received in *United States v. Palmer*, Criminal Case No. 90–039–S–EJL (D.Idaho Jan. 18, 1991). In addition, the court noted that the defendant would be given credit for the time he had served prior to sentencing. The court further ordered that following the term of confinement the defendant was to be placed under supervised release for a period of ten years, subject to the following terms and special conditions:

1. That the defendant abide by the standard terms and conditions of supervised release as recommended by the

United States Sentencing Commission and as required by the Anti–Drug Abuse Act of 1988.

2. That the defendant not commit any crimes, federal, state, or local.
3. That the defendant participate in a program of alcohol aftercare as directed by his Probation Officer.
4. That the defendant shall refrain from excessive use of alcohol and not possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances.
5. That the defendant shall not possess a firearm or other dangerous weapon.
6. That the defendant allow the United States Probation Officer to search his person, residence, or vehicle without a warrant and to seize any contraband uncovered.

Under the sentencing guidelines, 18 U.S.C. § 3553(c), the court is required to provide its reasons for imposing a particular sentence in open court at the time of sentencing. Accordingly, the court provided the defendant with the following REASONS FOR IMPOSING THIS PARTICULAR SENTENCE:

The court finds that the sentence imposed is appropriate and necessary given the court's desire to impose a sentence that reflects the nature and circumstances of the offense, the history and characteristics of the defendant, and the seriousness of the offense.

The court finds further that the ten-year term of supervised release is consistent with the mandatory minimum term set forth in Section 3583(d) of Title 18, United States Code, and Section 5D1.2(a) of the sentencing guidelines.

The court further finds that this sentence is of the kind and within the range established under the sentencing guidelines for an offense carrying a total offense level of 36 and a defendant with a criminal history category of IV.

The court further finds that this sentence is imposed only after taking into account any and all other applicable specific offense characteristics, role-in-the-offense adjustments, victim-related adjustments, and the adjustment for acceptance of responsibility, which are provided for under the sentencing guidelines.

The court finds that a sentence within the guideline range is appropriate given the seriousness of the offenses charged, the defendant's involvement and leadership in this criminal activity, and the defendant's extensive criminal history which includes numerous drug related offenses. The court further finds that a sentence at the lower end of the guideline range is appropriate in light of the fact that the court had to speculate as to the quantity and purity of drugs involved, and in light of the fact that this sentence shall run consecutively to the January 18, 1991, sentence you received in a related case pursuant to Section 5G1.3 of the sentencing guidelines.

In other words, the court sentenced the defendant at the lower end of the guideline range, only because he will be serving a consecutive 115–month sentence for the charges related to his cocaine distribution conviction. Without the 115–month sentence, the court would have sentenced the defendant at the upper end of the guideline range, mainly because of his extensive criminal history which has encompassed his entire adult life. As it stands, the defendant will have a combined sentence of 377 months for the charges contained in both indictments, which the court feels is adequate given the circumstances of this case.

The court finds further that the defendant is not able or likely, even with the use of a reasonable installment schedule, to become able to a pay a fine. Therefore, no fine has been imposed.

It is the court's hope that, the period of incarceration, together with a term of supervised release, will serve as adequate punitive measures to deter defendant from engaging in further criminal conduct, and will serve to deter others of like mind and attitude.

Finally, the court finds that this sentence was imposed after determining that there

WERE NO aggravating or mitigating factors sufficient to warrant a departure from the guideline range.

The court, following sentencing, advised the defendant further that he had a right to appeal and that the defendant had a period of ten days from the date of sentencing within which to file a notice of appeal with the clerk of the court. Thereafter, the proceedings were adjourned.