**UNITED STATES of America, Plaintiff,**

**v.**

**Randy Harvey BAKER, Philip Irvin Pavlik, Geoffrey Richard Wiitala, Defendants.**

**UNITED STATES of America, Plaintiff,**

**v.**

**Todd Brian LAMERE, Defendant.**

**Nos. 2:93–CR–05, 2:93–CR–24.**

United States District Court, W.D. Michigan, Northern Division.

Feb. 8, 1994.

Glenda Gordon, Asst. U.S. Atty., Marquette, MI, for plaintiff.

Eva A. Kipper, Marquette, MI, for defendant Randy Harvey Baker.

Kalen E. Lipe, Iron Mountain, MI, for defendant Philip Irvin Pavlik.

David L. Poindexter, Marquette, MI, for defendants Geoffrey Richard Wiitala, Todd Brian Lamere.

## OPINION

McKEAGUE, District Judge.

Defendants have either pled guilty to or been convicted of conspiracy to manufacture methcathinone, in violation of 21 U.S.C. § 846. They have appeared before the Court for the purposes of sentencing. Pursuant to the Sentencing Guidelines promulgated by the United States Sentencing Commission, the amount of the methcathinone attributable to the defendants must be considered in determining the appropriate sentence. The parties disagree as to the appropriate procedure for determining the amount of Methcathinone involved. The Court has carefully considered the motions filed in this matter, the responses, attachments, testimony of witnesses, and arguments of counsel.

 At sentencing, the prosecution bears the burden of proving, by a preponderance of the evidence, the quantity of drugs involved. *United States v. Sims,* 975 F.2d 1225, 1242 (6th Cir.1992). Where there is no drug seizure, the Court must approximate the quantity of drugs involved. *Id.;* U.S.S.G. § 2D1.1, Application Note 12 (1993). "[W]hen choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution." *Sims,* 975 F.2d at 1243.

In the present cases, the parties agree that the quantity of methcathinone for sentencing purposes is determined by approximating the potential yield of the methcathinone laboratories. They disagree, however, as to how that potential yield is to be determined. The government asks that the Court focus on the amount of precursor chemicals seized or attributable to the defendants, and calculate the maximum potential yield from those precursors. According to the government, the reasonable potential yield from a given amount of precursors synthesized in a clandestine laboratory, such as those operated in these cases, is 50%. The government contends that additional factors are irrelevant, as they do not affect the amount of drugs which the defendants *intended* to manufacture. The defendants, conversely, maintain that the court should take into account a large number of factors, and that the government's estimate of 50% yield is unreasonable when these additional variables are considered. The additional factors the defendants argue must be taken into consideration include, but are not limited to: The skill of the "cooker;" the "recipe" for Methcathinone used; the purity of the precursors; the amount of precursors used; the type of filler used in the Ephedrine; whether the precursors were properly weighed and mixed; the melting point; the cooling time; the stirring time; the size of the batch produced; the number of batches produced by the "cooker;" the cleanliness of the laboratory equipment used; the reaction method; the reaction chemicals used; the separation method, involving extraction and precipitation; the separation chemicals used; the purification process; the purification chemicals used; the presence of noxious fumes in the laboratory; and environmental variables such as air temperature and the humidity level. The Court is thus called on to determine what factors affecting the potential yield of a methcathinone laboratory should be considered when determining the quantity of the controlled substance for purposes of sentencing.

In approximating the quantity of methcathinone attributable to the defendants, the Sentencing Guidelines specify that this Court may consider "the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." U.S.S.G. § 2D1.1, Application Note 12 (1993). The guidelines thus expressly note that laboratory capabilities are an appropriate factor

to consider. *See United States v. Brannon,* 7 F.3d 516, 519 (6th cir.1993).

■ The guidelines further specify that when an offense, such as a conspiracy, "involves negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount." § 2D1.1, Application Note 12. The Court may exclude from the guideline calculation only those amounts in negotiation which the defendant (1) did not intend to produce, and (2) was not reasonably capable of producing. *Id.* Thus, in cases involving conspiracy to manufacture and distribute methamphetamine, the inexperience of the cooker does not operate to reduce the amount of drugs attributable to the defendant, unless there is also proof that the defendant did not *intend* to produce the full amount in negotiation. "The court is required to exclude an unsuccessfully negotiated amount only where the defendant lacked both the intent *and* the ability to complete the drug transaction." *United States v. Brooks,* 957 F.2d 1138, 1151 (4th Cir.1992) (emphasis in original); *see United States v. Palmer,* 761 F.Supp. 697, 705 (D.Idaho 1991) (despite court's concern that the defendants were not capable of producing the amount, court could not reduce it as defendants did have the intent to produce such amount).

Although the guidelines do not specifically address how the Court should calculate the amount of controlled substances in cases of conspiracy to manufacture, not involving negotiation to traffic in the drug, the above guideline commentary and cases suggest that variables such as a cooker's inexperience in manufacturing the drug should not matter so long as the individuals involved in the conspiracy possessed the *intent* to produce a certain amount. The best approach, in the Court's view, is to calculate the guideline amount based on the amount of Methcathinone that presumably would have been involved had the defendants been successful. *United States v. Kingston,* 922 F.2d 1234, 1237–38 (6th Cir.), *cert. denied,* 500 U.S. 933, 111 S.Ct. 2054, 114 L.Ed.2d 460 (1990) (basing the sentence on the amount of the controlled substance that would have been in-

volved had defendant been successful was the fairest approach).

The Sixth Circuit implicitly approved this approach in *United States v. Brannon,* 7 F.3d 516, 519 (6th Cir.1993). In *Brannon,* the district court considered the affidavits of two chemists concerning the capabilities of a methamphetamine laboratory. The DEA chemist stated that based upon the "recipe" for methamphetamine and laboratory glassware possessed by the defendant, the laboratory was capable of producing 200 pounds of the drug. The second affidavit, submitted by the defendant, concluded that the laboratory only had a reasonable capability of producing approximately 109 grams of pure methamphetamine—about 8 ounces street ready. The Court of Appeals upheld the district court's conclusion that the laboratory had a 200-pound capability, rejecting the defendant's argument that the district court should have erred on the side of caution and attributed only 8 ounces to the defendant. *Id.* The Sixth Circuit thus found that it was appropriate for the district court to focus solely on the objective yield of the laboratory.

Other circuits have reached similar conclusions. In *United States v. Funk,* 985 F.2d 391, 393–94 (8th Cir.1993), the Eighth Circuit held it was proper for the district court to rely on testimony concerning the maximum yield based on the amount of precursor chemicals seized. The court rejected the defendants' argument that such reliance was improper given that they were inexperienced "cooks" using filthy laboratory equipment. *Id.* More pertinent, in *United States v. Wagner,* 884 F.2d 1090, 1097–98 (8th Cir. 1989), the same Court of Appeals affirmed the trial court's decision to use the higher estimate of methamphetamine production, despite the defendants' inexperience and the fact that no methamphetamine was ever even produced. According to the Eighth Circuit, the higher amount was the actual "object of the attempt," and was thus the appropriate estimate for purposes of sentencing. *Id.; see also United States v. Barnett,* 989 F.2d 546, 552–53 (1st Cir.1993) (trial court was correct to approximate the quantity of methamphetamine from the amount of precursors pos-

sessed by the defendant and the size and capability of the laboratory). *But see United States v. Havens,* 910 F.2d 703, 706 (10th Cir.1990) (noting trial court's determination of the quantity of drugs could be influenced by "the availability or cost of missing components, the quality of the 'cooker' assigned to mix the chemicals, and many other factors").

■ Based on the caselaw, the Court is convinced that the panoply of factors potentially affecting yield raised by the defendants should not be considered when determining the amount of Methcathinone attributable to defendants. Most, if not all, of these factors are not known with respect to the individuals involved, even where the government has seized an operating laboratory, and are not capable of determination at a later date. In fact, as the defense expert himself testified, even if the Court were to take these factors into account, it is not known what affect these variables may have on total yield; they might lower or they might increase the total yield of Methcathinone.

The government has produced ample evidence supporting the 50% figure as a reasonable yield percentage. The government witnesses testified to achieving yields of 27%, 65%, and 55.2% in laboratory attempts to produce Methcathinone, even though they were not attempting to maximize yield. An expert chemist testifying for the government stated that, based upon his knowledge of and experience with clandestine laboratories, 50% was a reasonable yield from a clandestine laboratory such as those operated by the defendants. Evidence in these cases indicates that yields as high as 56% are properly attributable to the defendants. The Court finds that the 50% figure is supported by a preponderance of the evidence, and best reflects the actual *intent* of the defendants, which is to achieve the highest reasonable yield from their manufacturing efforts.

The defendants further argue that the Court should base its determination on the actual yields which they achieved in their clandestine laboratories. The yields attributable to the defendants range from 0% to 56%. The Court notes that were it to follow this approach, a defendant who never successfully manufactured Methcathinone de-

spite a clear intent to do so and possession of all the necessary chemicals, could not be sentenced under the guidelines as no drugs would be attributable to that defendant. The more appropriate method, the Court finds, is to determine the *reasonable amount* of Methcathinone which the defendants could have produced if successful. As determined above, that reasonable amount shall be calculated based on a yield of 50% of the precursors attributable to the defendants.

Considerations of judicial economy and conservation of court resources further support the Court's decision to compute the volume of methcathinone on the basis of the objective yield of the laboratory alone. If this Court were to consider the other factors identified in this hearing, many of which are subjective, sentencing hearings would become lengthy mini-trials more involved than the trials themselves. The Court is convinced that such drawn-out proceedings would not serve the interests of justice and are not required by the Sentencing Guidelines.

For the foregoing reasons, therefore, the Court concludes that the volume of methcathinone for purposes of sentencing shall be determined by considering the potential yield of the laboratory, based on the equipment and quantity of precursor chemicals attributable to the defendants, and that an amount of Methcathinone equal to 50% of the precursors attributable to the defendants is a reasonable and appropriate amount to utilize for purposes of the drug equivalency determination under the Sentencing Guidelines.