1138

UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael Denard BROOKS,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Johnny X. WILLIAMSON,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Melvin Eugene FLINT, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles Russell FORD, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Linda Mitchell PEAY, Defendant–
Appellant.

Nos. 90–5240 to 90–5242, 90–
5247 and 90–5733.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1991.

Decided Feb. 28, 1992.

As Amended March 5, 1992.

Rehearing and Rehearing En Banc
Denied March 12, 1992.

Susan Hayes, Greensboro, N.C., argued (Walter T. Johnson, Jr., Greensboro, N.C., for defendant-appellant Brooks; Charles O. Peed, Jr., Winston–Salem, N.C., for defendant-appellant Williamson; J. Matthew Martin, Martin & Martin, P.A., for defendant-appellant Ford; Thomas H. Johnson, Jr., Greensboro, N.C., for defendant-appellant Flint; Anne R. Littlejohn, Greensboro, N.C., for defendant-appellant Peay, on the brief), for defendants-appellants.

David Bernard Smith, Asst. U.S. Atty., Senior Litigation Counsel, Greensboro, N.C., argued (Robert H. Edmunds, Jr., U.S. Atty., Greensboro, N.C., on the brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, LUTTIG, Circuit Judge, and RESTANI, Judge, United States Court of International Trade, sitting by designation.

## OPINION

LUTTIG, Circuit Judge:

Appellants were convicted of conspiracy to distribute cocaine. All five appellants challenge their convictions. We affirm all five convictions. Two appellants also challenge their sentences. We affirm one of these sentences, vacate the other sentence, and remand for resentencing.

### I.

This case arises out of the prosecution of five principals of a large drug operation for conspiracy to distribute cocaine hydrochloride. *See* 21 U.S.C. §§ 841(a)(1), 846.[1] Trial was held in federal district court in the Middle District of North Carolina beginning August 13, 1990. The defendants were convicted on all counts on August 20, 1990, and thereafter sentenced to various terms of incarceration.

Defendants collectively raise five sets of claims on appeal. First, all five defendants contend that the district court erred in denying their motions for a mistrial following the jury's accidental exposure to allegedly prejudicial material. Second, defendants Brooks and Peay claim that the district court erred in denying their request that the court ask prospective jurors during *voir dire* whether they believed that young black men were more likely to commit crimes than men of other races. Third, defendants Brooks, Williamson, and Peay claim that the district court erred in denying their motions for severance. Fourth, defendants Brooks, Williamson, Flint, and Ford claim that the Government's evidence was insufficient to support their convictions, and thus that the district court erred in denying their motions for judgment of acquittal. Fifth, defendants Brooks and Peay claim that the district court committed numerous errors in calculating their sentences.

Only Brooks' claim that his sentence was improperly enhanced has merit, and only the challenge to the district court's refusal

to order a mistrial warrants extended discussion.

### II.

Immediately before concluding its case in chief, the Government sought to play a tape recording of a May 9, 1989, conversation between defendant Williamson and two federal agents who were posing as drug dealers. The jury was provided with copies of what the Government represented to be an accurate seventy-three page transcript of the recording prior to the playing of the tape. The district court explained to the jury that "the transcripts [were] being provided for [their] convenience and guidance as [they] listen[ed] to the tapes [sic] for purpose [sic] of clarifying portions of the tape which may be difficult to hear; and for the further purpose of identifying speakers." J.A. at 817.

Shortly after the Government began to play the tape, it became apparent that the transcript that had been distributed to the jury did not correspond to the tape recording. When the dissimilarity between the transcript and the recording was discovered, the jury was excused. Counsel for each of the defendants then moved for a mistrial. The Assistant United States Attorney ("AUSA") thereafter informed the court that the jury had been provided with a version of the transcript that mistakenly included two pages from a transcript of a different conversation between Williamson and the agents. The AUSA explained that the two pages had apparently been inserted into the transcript inadvertently when copies of the transcript were being prepared for distribution to the jury. *Id.* at 826.

Following the AUSA's explanation of how the error had occurred, the district court stated for the record that

the members of the jury had [the inaccurate transcript] in their possession for five, ten, twelve minutes while we were trying to set this up. When the [AUSA] attempted to play it, I sat here and tried

---

1. Defendant Peay was also charged with and prosecuted for possession with intent to distribute cocaine hydrochloride and heroin, *see* 21 U.S.C. § 841(a)(1); for a firearm offense, *see* 18 U.S.C.A. § 924(c)(1); and for money laundering, *see* 18 U.S.C. § 1957.

to find out where we were on the transcript, went over as much as five pages; and I noticed. that the jurors were doing the very same thing, trying to ... link up the transcript with what snatches they were hearing....

*Id.* at 821. The court told defense counsel to review the "first five to ten pages, and see if there is anything in there that could possibly be prejudicial to anyone," and that he would then hear further argument on the motion for a mistrial. *Id.*

Defendant Peay's attorney, Anne R. Littlejohn, in response to the court's invitation to review the transcript, identified as prejudicial a single reference to Terry Smith, a defendant in what Ms. Littlejohn characterized as "a fairly notorious [drug] case" that had been tried before the same court. *Id.* at 830.[2] Counsel for the other four defendants joined Ms. Littlejohn in objecting to the reference. Ms. Littlejohn apparently argued that the mere reference to Smith by Williamson prejudiced the defendants; she did not argue that they were prejudiced by the fact that Williamson said he was "trying to do" what Smith had done.

The court stated that the reference to Smith "standing by itself doesn't mean anything to me, even though I was the trial Judge in that case," and that he did not "see anything prejudicial" in the reference. *Id.* at 831. The court denied the motion for a mistrial, *id.* at 822, and ruled that neither the transcript nor the tape recording could be considered by the jury, *id.* at 838. It then instructed the jury to "disregard, eradicate, erase from your mind anything that you may have ... read or heard, during the aborted attempt to play the tape and get to the proper place in the transcript with the tape." *Id.* at 839.

Defendants argue on the authority of *United States v. Barnes,* 747 F.2d 246 (4th Cir.1984), and *United States v. Greene,* 834

F.2d 86 (4th Cir.1987), that the district court erred in denying their motion for a mistrial. In *Barnes* and *Greene,* this court held that a presumption of prejudice arises when a jury is exposed to exhibits that have not been admitted into evidence, and that the burden is upon the Government to show that the jury was not prejudiced. *Barnes,* 747 F.2d at 250–51; *Greene,* 834 F.2d at 88. Defendants argue that rather than imposing the burden on the Government to show the absence of prejudice, the district court impermissibly placed the burden on the defendants to prove prejudice when it required them to identify prejudicial statements in the transcript. Alternatively, the defendants argue that if in fact the court imposed the burden to overcome the presumption of prejudice on the Government, the Government failed to do so.

The Government argues that because the tape and the transcript had previously been received into evidence, *Barnes* and *Greene* are inapposite, and the case is controlled instead by *United States v. Jones,* 907 F.2d 456 (4th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 683, 112 L.Ed.2d 675 (1991). The Government reads *Jones* to hold that where an admitted exhibit is subsequently withdrawn and a curative instruction given by the trial court, the defendant must make a "powerful showing of harm" to obtain a mistrial. Appellee's Br. at 20–21. The Government argues that the defendants failed to make such a showing of harm.

We agree with the defendants that *Barnes* and *Greene* control (although for reasons different from those posited by the defendants), but we conclude that the Government has successfully overcome any presumption of prejudice that arose from the jury's viewing of the inadvertently included transcript pages.[3]

---

**2.** Defendant Williamson had mentioned Smith during the taped conversation with the undercover agents. In its entirety, Williamson's reference to Smith was as follows:

> This, this area right there, this is one of the biggest ... this boy right here owns, he's probably worth 10 million dollars. That's why ya'll know TERRY SMITH. Now he did

> what I'm trying to do. But he made his money too fast.

> J.A. at 1086.

**3.** We see no merit in defendants' argument that the district court's request that they identify prejudicial statements in the transcript was tantamount to a presumptive determination that the defendants were not prejudiced.

The defendants concede that the transcript distributed to the jury had previously been admitted into evidence, but assert—essentially without authority—that there should be a presumption of prejudice nonetheless. *See* Appellants' Br. at 11. We disagree that the allegedly prejudicial transcript had been admitted into evidence. The court admitted into evidence an accurate transcript of the May 9, 1989, conversation. *See* J.A. at 656. The transcript distributed to the jury included portions of text from a transcript of a different conversation between Williamson and the agents. The transcript received by the jury thus was not the exhibit admitted into evidence. Therefore, contrary to the Government's assertion, this is not a case like *Jones*, in which an exhibit that had been admitted into evidence was subsequently withdrawn. It is, as the defendants contend (albeit for different reasons), a case factually similar to *Barnes* and *Greene*.

Although a presumption of prejudice did arise by virtue of the distribution of the unadmitted transcript, we conclude that the Government successfully rebutted this presumption. Evidence is prejudicial if there is a " 'reasonable possibility that the jury's verdict was influenced by the materials that improperly came before it.' " *Barnes*, 747 F.2d at 250 (quoting *Llewellyn v. Stynchcombe*, 609 F.2d 194, 195 (5th Cir. 1980)). The only portion of the transcript that was potentially prejudicial was the reference to Terry Smith identified by Ms. Littlejohn. It is highly unlikely that the jurors focused on the reference to Smith, if they saw it at all, and it is even less likely that they focused on the reference and understood it to be to the defendant in a notorious drug trial.

The jurors had the seventy-three page transcript in their possession at most only twelve (and perhaps as few as five) minutes before they were asked to return their copies, and during that brief time they were trying to find their place in the document while simultaneously listening to the tape recording. The court apparently had the time to review only some five pages during this period. The possibility is remote that under these circumstances the jurors stopped at the page on which the reference to Smith appeared, focused on his name, recognized it as the name of a criminal defendant in a publicized case, and were influenced in their assessment of the Government's case against Williamson, and thereby in their assessment of the cases against the other defendants, by the fact that Williamson knew of Smith. The mention of Smith's name did not make an impression even on Judge Ward, in whose court Smith had been prosecuted.[4]

We review a district court's denial of a motion for a mistrial under an abuse of discretion standard. *United States v. West*, 877 F.2d 281, 287–88 (4th Cir.1989). There is no evidence that the jurors saw the single reference to Smith. *Cf. Barnes*, 747 F.2d at 250 (jurors had "looked at" all three unadmitted exhibits and had "read" one); *Greene*, 834 F.2d at 88 (jurors had "viewed" eleven of twenty-one unadmitted exhibits). And even if the jurors did see the reference to Smith, it is unlikely that they were prejudiced against the defendants as a result. *Cf. Barnes*, 747 F.2d at 250 (unadmitted exhibits viewed by jury included tape recording and transcript of telephone conversation during which defendant and coconspirator planned illegal transaction); *Greene*, 834 F.2d at 88 (defendant was prosecuted for submitting false claims to Department of Defense; unadmitted exhibits viewed by jury consisted of six claims for payment totalling nearly one million dollars). We therefore conclude that the district court did not abuse its discretion in denying defendants' motion for a mistrial.

### III.

■ Brooks and Peay appear to claim that the district court erred in refusing to ask prospective jurors a series of questions

---

**4.** There is some question whether even defense counsel originally considered the mention of Smith's name prejudicial. Smith's name appears in the accurate version of the transcript, and defense counsel apparently did not ask that it be redacted. In fact, the reference appears only a few lines beneath material that counsel did ask to be redacted. J.A. at 1037.

dealing with racial prejudice during *voir dire.* Brooks and Peay requested that prospective jurors be asked, *inter alia,* whether they believed that a black person was less likely than a white person to tell the truth, and whether a black person was more likely than anyone else to commit a crime. J.A. at 20.[5]

The Supreme Court has held that "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups," *Rosales-Lopez v. United States,* 451 U.S. 182, 190, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1981), and that "[t]he 'special circumstances' under which the Constitution requires a question on racial prejudice" exist when "racial issues [a]re 'inextricably bound up with the conduct of the trial,'" *id.* at 189, 101 S.Ct. at 1635 (quoting *Ristaino v. Ross,* 424 U.S. 589, 597, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976)). The Court has also announced a "nonconstitutional standard," *id.* 451 U.S. at 190, 101 S.Ct. at 1635, derived from its supervisory authority over the federal courts, under which failure to honor a request that prospective jurors be questioned about racial prejudice "will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial ... prejudice might have influenced the jury." *Id.* at 191, 101 S.Ct. at 1636.

The district court was clearly within its discretion under both the constitutional and the supervisory standards to refuse to ask the questions requested by the defendants. This is not a case in which racial issues permeated the trial; race was not a factor in the case at all. *See* J.A. at 921 (district court stated for record that "[r]ace was not an issue in this case," and that several jurors and witnesses, as well as prosecutor,

were black). Nor was this a case in which there was evidence of a "reasonable possibility" of racial prejudice by the jury; there was no evidence of racial prejudice whatever. Counsel for defendant Brooks stated that the reason he requested that the questions be asked of prospective jurors was the "association of young black men with the cocaine traffic" in Greensboro. J.A. at 172. He did not allege or suggest that there had been a disproportionate number of black men charged with or convicted of narcotics offenses, or even that there had been evidence of racial prejudice among jurors in any of their trials. Neither he nor Peay's counsel proffered evidence of possible racial prejudice in this case or argued that the potential for prejudice inhered in this particular proceeding. Appellants' brief contains only a single conclusory sentence in behalf of each defendant, without citation of authority. Appellants' Br. at 27, 33; *see supra* note 5.

■ We review the district court's refusal to ask requested *voir dire* questions for abuse of discretion. *Rosales-Lopez,* 451 U.S. at 189, 101 S.Ct. at 1634; *United States v. Robinson,* 804 F.2d 280, 283 (4th Cir.1986). There is no evidence in this record that would suggest even a "reasonable possibility" of racial prejudice by the jury. This was an ordinary narcotics prosecution, in which race was simply not an issue. *See United States v. McDowell,* 539 F.2d 435, 437 & n. 1 (5th Cir.1976). Accordingly, we conclude that the district court did not err in refusing to ask the jurors about possible racial prejudice.[6]

## IV.

■ The district court denied pretrial motions for severance, *see* Fed.R.Crim.P.

---

5. Both Brooks and Peay submitted questions on racial prejudice for the court's consideration. J.A. at 20, 63, 172. Peay also submitted questions on juror prejudice toward those who possess firearms. *Id.* at 20–21, 173. Appellants' brief includes only a single sentence in support of Brooks' *voir dire* claim and a single sentence in support of Peay's *voir dire* claim. The two sentences state that the district court erred in refusing to ask "the questions requested," Appellants' Br. at 27 (Brooks), and "certain ques-

tions," *id.* at 33 (Peay). Neither sentence reflects whether the claim is directed to the racial prejudice or the firearms questions, or to both.

6. To the extent that Peay is also appealing the district court's refusal to ask the jurors about their attitudes toward those who possess firearms, we hold that the court did not abuse its discretion by not asking these questions.

14, filed by defendants Brooks, Williamson, and Peay. *See* J.A. at 109–15, 121–29. All three defendants claim that the district court erred in denying their motions. Brooks and Peay claim that their trials should have been severed from that of Williamson. Williamson claims that his trial should have been severed from that of all four of his codefendants.

Brooks argues that the evidence against him was significantly weaker than the evidence against the other defendants and, therefore, that he may have been convicted on the strength of "spillover" evidence. Appellants' Br. at 25–26. Williamson, too, advances a "spillover" argument, and also argues that he was insufficiently connected to his codefendants to permit them to be tried together. *Id.* at 30–32.

Peay argues that extrajudicial statements made by Williamson incriminated her, and therefore that *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), required that her trial be severed from Williamson's. Appellants' Br. at 33.

■ Defendants who have been charged in the same conspiracy indictment should ordinarily be tried together. *United States v. Roberts*, 881 F.2d 95, 102 (4th Cir.1989). The party moving for severance must establish that prejudice would result from a joint trial, Fed.R.Crim.P. 14, not merely that separate trials would result in a better chance of acquittal, *Roberts*, 881 F.2d at 102. The fact that the evidence against one defendant is stronger than the evidence against other defendants does not in itself justify severance. *United States v. Hargrove*, 647 F.2d 411, 415 (4th Cir. 1981). If this were the case, motions to sever, which are rarely granted in conspiracy cases, *see United States v. Haney*, 914 F.2d 602, 606 (4th Cir.1990) (dictum), would have to be granted almost as a matter of course.

The record before the district court at the time of its ruling on the motions for severance did not support the claims of prejudice made by Brooks and Williamson. Nor does the complete record that we have before us on appeal indicate that either Brooks or Williamson was convicted on the basis of "spillover" evidence. Apparently, the district court properly instructed the jury that it was not to consider the evidence against one defendant when deciding upon the guilt or innocence of another defendant, and there is no suggestion in the record that the jury failed to follow this instruction. There was abundant evidence—independent of the evidence against their codefendants—supporting the convictions of both Brooks and Williamson. *See infra* section V. This is not a case in which a defendant was "convicted simply by innuendo because his associates were plainly guilty." *Hargrove*, 647 F.2d at 415.[7]

We review a district court's denial of a motion for severance under an abuse of discretion standard. *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *Haney*, 914 F.2d at 606 (district court's denial of motion to sever "will not be overturned absent a clear abuse of discretion"); *United States v. Mandel*, 591 F.2d 1347, 1371 (4th Cir.) ("Severance will not be granted when the claim is based on the disparity of evidence adduced against individual defendants without a strong showing of prejudice...."), *vacated on other grounds*, 602 F.2d 653 (4th Cir.1979) (*en banc*), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). There is no basis in the record for concluding that the district court abused its wide discretion in denying Brooks' and Williamson's severance motions.

■ Peay's *Bruton* claim is equally unavailing. In *Bruton v. United States*, 391

---

7. Defendant Brooks also maintains that he was prejudiced by having been tried with defendant Peay, since she was charged with a firearms offense and he was not. Because Brooks did not move below to sever his trial from Peay's, we will take cognizance of his claim only if the district court committed plain error. *United States v. Seidlitz*, 589 F.2d 152, 160 (4th Cir. 1978), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979); *see* Fed.R.Crim.P. 52(b). We find nothing in the record that would suggest that the trial of Brooks and Peay together constituted plain error.

U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that a defendant's rights under the Confrontation Clause of the Sixth Amendment are violated by the admission of a nontestifying codefendant's confession that incriminates the defendant. A consequence of *Bruton* is that the Government must prosecute a defendant and a nontestifying codefendant separately when it intends to introduce against the defendant incriminating statements made by the codefendant, or it must forgo use of the incriminating statements altogether. Peay argues that the testimony of the undercover agents regarding their negotiations with Williamson required severance of her trial from his under *Bruton*. She contends that the Government intended to use Williamson's out-of-court statements to prove "the existence of a conspiracy and thereby to prove defendant Peay was part of the conspiracy." Appellants' Br. at 33.

■ There is considerable doubt whether Peay was sufficiently implicated by Williamson's statements that *Bruton* would require severance. *Bruton* is a "narrow exception" to the principle that jurors are assumed to follow their instructions, and it applies when a nontestifying codefendant's statements are "facially incriminating." *Richardson v. Marsh*, 481 U.S. 200, 207, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987). *Bruton* does not apply where the codefendant's statement is redacted to eliminate any reference to the defendant, *id.* at 211, 107 S.Ct. at 1709, or where the defendant's name is replaced by a "symbol or neutral pronoun," *United States v. Vogt*, 910 F.2d 1184, 1191–92 (4th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). Here, Williamson mentioned Peay's husband Benjamin Peay, the leader of the drug operation, who was not a defendant in the case. Defendant Peay herself, however, was not mentioned—by name or otherwise—in any of Williamson's statements, nor was her marital relationship with Benjamin Peay referenced. Thus, although there is an argument that Peay was more incriminated by Williamson's statements than was the defendant in *Marsh* by her codefendant's confession, Williamson's statements, in character, are more like the "inferential[ly] incriminati[ng]" statements in *Marsh*, 481 U.S. at 208, 107 S.Ct. at 1708, than like the facially incriminating statements in *Bruton*.

We need not determine, however, the degree to which Peay was implicated (if at all) by Williamson's statements, or even whether Williamson's statements are more akin to the confession in *Marsh* than to the confession in *Bruton*. Because Williamson's out-of-court statements were admissible against Peay as statements "by a co-conspirator of a party during the course and in furtherance of the conspiracy," Fed. R.Evid. 801(d)(2)(E), severance was not required under *Bruton*. *See Folston v. Allsbrook*, 691 F.2d 184, 187 (4th Cir.1982) ("Where the incriminating admissions of the nontestifying codefendant are admissible against th[e] defendant under the rules of evidence, *Bruton* is inapplicable."), *cert. denied*, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 314 (1983).[8] The district court, therefore, did not abuse its discretion in denying Peay's severance motion.

## V.

■ Brooks, Ford, Flint, and Williamson moved for judgment of acquittal, *see* Fed.R.Crim.P. 29(a), after the Government presented its evidence. *See* J.A. at 844–56. All four defendants argue that there was insufficient evidence in the record to support their convictions and thus that the district court erred in refusing to enter judgments of acquittal. The gravamen of their claims is that the Government proved

---

**8.** Evidence is admissible under Rule 801(d)(2)(E) if (1) a conspiracy existed; (2) the declarant and the defendant were members of the conspiracy; (3) and the statement was made during the course and in furtherance of the conspiracy. *United States v. Jackson*, 863 F.2d 1168, 1171 (4th Cir.1989). There was sufficient evidence, prior to the testimony of the undercover agents, that a conspiracy existed and that Williamson and Peay were part of it. *See* J.A. at 344–438. Nor is there any question that Williamson's statements to the agents were made during the course and in furtherance of the conspiracy.

that each defendant associated with the other defendants, but failed to prove that each actually conspired with the others. *See* Appellants' Br. at 14–15, 30, 38, 40.

 "To sustain [a] conspiracy conviction, there need only be a showing that the defendant knew of the conspiracy's purpose and some action indicating his participation." *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir.1984), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985); *accord United States v. Crockett*, 813 F.2d 1310, 1316 (4th Cir.), *cert. denied*, 484 U.S. 834, 108 S.Ct. 112, 98 L.Ed.2d 71 (1987). Once it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction. *United States v. Seni*, 662 F.2d 277, 285 n. 7 (4th Cir.1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed.2d 664 (1982). A defendant need not have had knowledge of his coconspirators, *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); *United States v. Burman*, 584 F.2d 1354, 1356 (4th Cir.1978), *cert. denied*, 439 U.S. 1118, 99 S.Ct. 1026, 59 L.Ed.2d 77 (1979), or knowledge of the details of the conspiracy, *Blumenthal*, 332 U.S. at 557, 68 S.Ct. at 256; *United States v. Roberts*, 881 F.2d 95, 101 (4th Cir.1989). And a defendant may be convicted despite having played only a minor role in the overall conspiracy. *Roberts*, 881 F.2d at 101.

There is ample evidence establishing the active participation of Brooks, Ford, Flint, and Williamson in the conspiracy. Two different witnesses testified at trial that Brooks had served as a lookout in the drug operation, J.A. at 273, 300, and two different witnesses testified that he had been a dealer, *id.* at 298–300, 349–50. Another witness testified that he had observed Brooks in an argument with defendant Peay's husband, Benjamin Peay, over a drug package, and had witnessed an exchange of money between Brooks and other members of the drug organization. *Id.* at 376–77.

As for Ford, one witness testified that he had been a messenger in the drug operation, *id.* at 300, 308; one witness testified that he had been a lookout, *id.* at 475; and two witnesses testified that he had been a dealer, *id.* at 295, 298, 309, 349. One of the "lieutenants" in the operation, Cathy Torry, testified that Ford was her "best seller." *Id.* at 309.

The evidence against Flint was equally substantial. Robert Williams, another "lieutenant" in the operation, testified that he had hired Flint as a bodyguard, and that on more than one occasion Flint accompanied him when he delivered drugs and picked up money, *id.* at 274–76; another witness testified that Flint sold cocaine, *id.* at 349; and a third witness testified that Flint worked for Benjamin Peay, *id.* at 231.

As for Williamson, an associate of Benjamin Peay testified that on one occasion Williamson received three kilograms of cocaine from Benjamin Peay, *id.* at 368; that on another occasion Williamson received approximately a half kilogram of cocaine, *id.* at 380; and that on two or three other occasions defendant Peay received smaller quantities of cocaine from Williamson, *id.* at 372–73. Two federal agents testified that they had engaged in negotiations with Williamson regarding the sale of twenty kilograms of cocaine. *Id.* at 588–700.

We review a district court's denial of a motion for judgment of acquittal under the familiar sufficiency of the evidence standard. *United States v. Espinoza–Leon*, 873 F.2d 743, 745–46 (4th Cir.) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)), *cert. denied*, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989). Viewed in the light most favorable to the Government, as it must be, the evidence recited above was more than sufficient to support a determination by the jury that Brooks, Ford, Flint, and Williamson each participated in a drug conspiracy and were not mere "associates."

## VI.

Brooks and Peay claim that the district court erred in determining their sentences. Brooks claims that the court made four separate errors with respect to his sen-

tence. He argues that the court miscalculated his base offense level by holding him responsible for drugs that were obtained before he had become a member of the conspiracy, Appellants' Br. at 18–21; mistakenly increased his offense level for possession of a weapon, *id.* at 21–22; incorrectly refused to decrease his offense level for his "minor" role in the offense, *id.* at 23–24; and erroneously increased his offense level for obstruction of justice, *id.* at 2223.

Peay contends that the district court made two errors in determining her sentence. First, she contends that the court miscalculated her base offense level by holding her responsible for drugs that a coconspirator attempted to purchase but was not reasonably capable of purchasing, and that were insufficiently connected to any conspiracy of which she was a part. *Id.* at 33–36. Second, she argues that the court mistakenly increased her offense level for her role in the conspiracy. *Id.* at 36–37.

We accord substantial deference to the factual determinations underlying a district court's imposition of sentence. Those determinations, which need only be supported by a preponderance of the evidence, *United States v. Urrego–Linares,* 879 F.2d 1234, 1238 (4th Cir.), *cert. denied,* 493 U.S. 943, 110 S.Ct. 346, 107 L.Ed.2d 334 (1989), will not be disturbed unless they are clearly erroneous. 18 U.S.C. § 3742(e); *United States v. Vinson,* 886 F.2d 740, 742 (4th Cir.1989) (amount of drugs involved in conspiracy), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990); *United States v. Apple,* 915 F.2d 899, 914 (4th Cir.1990) (possession of firearm); *United States v. Daughtrey,* 874 F.2d 213, 218 (4th Cir.1989) (mitigating role in offense); *United States v. Sheffer,* 896 F.2d 842, 846 (4th Cir.) (aggravating role in offense), *cert. denied,* —— U.S. ——, 111 S.Ct. 112, 112 L.Ed.2d 82 *and cert. denied,* —— U.S. ——, 111 S.Ct. 432, 112 L.Ed.2d 416 (1990). We cannot conclude that any of the district court's factual findings were clearly erroneous. The district court erred as a matter of law, however, in enhancing Brooks' sentence for obstruction of justice. We there-

fore affirm Peay's sentence, but vacate Brooks' sentence and remand for resentencing.

### A.

■ The district court determined that Brooks was already a coconspirator in September of 1988, and thus held him responsible for six kilograms of cocaine that Williamson obtained when he traveled to Florida in September of 1988. Brooks claims that the court erred in attributing these six kilograms to him, because he was not a part of the conspiracy at the time that trip was made.

There was ample evidence from which the district court could reasonably conclude that Brooks was a participant in the conspiracy at the time of Williamson's Florida cocaine purchase. Robert Williams testified that he began working in the organization sometime in 1986, J.A. at 268, that he was promoted to "lieutenant" a year to a year and a half after he started working, *id.* at 271–72, and that at the time of his promotion (at the latest, sometime in the second half of 1987 or the first half of 1988) Brooks had been working for him for "about three or four months," *id.* at 272. Cathy Torry also testified that she began working in the organization "[a]round September, '88," *id.* at 292, and that Brooks "was already there when [she] got there," *id.* at 300. There was no error—clear or otherwise—in the district court's determination based upon this evidence that Brooks was a member of the conspiracy at the time of the Florida purchase.

■ Brooks next challenges the increase of his offense level based upon defendant Peay's possession of firearms. *See* United States Sentencing Commission, *Guidelines Manual* § 2D1.1(b)(1) (Nov. 1990) ("U.S.S.G.") (two-level increase "[i]f a dangerous weapon (including a firearm) was possessed during commission of the offense"). Brooks is subject to a sentence enhancement for Peay's possession of firearms if such possession was in furtherance of the conspiracy and reasonably foreseeable to Brooks. *See id.* § 1B1.3, comment.

(n. 1) (in conspiracy case, conduct for which defendant is accountable "includes conduct of others in furtherance of the execution of the jointly undertaken criminal activity that was reasonably foreseeable by the defendant"). The district court's determination that these conditions were satisfied is not clearly erroneous.

Two murders were committed during the time that Brooks was a part of the conspiracy. J.A. at 975–76, 1080. The court stated during sentencing that

> [i]n this conspiracy, moreso [sic] than any other conspiracy this Court has ever tried, guns were of the foremost importance. It eludes me that anyone who was a member of the conspiracy did not know that guns were involved.... Guns were available in abundance and are in evidence in this case....

*Id.* at 984. Brooks himself testified that at about the time of one of the murders, he was threatened at gunpoint by two of his coconspirators. *Id.* at 975–76. Thus, there was ample evidence from which the district court could conclude that the possession of firearms was in furtherance of the conspiracy, and that the possession, if not the use, of firearms was foreseeable to Brooks.

■ Brooks' third claim is that his offense level should have been decreased, since he played what he characterizes as only a minor role in the offense. *See* U.S.S.G. § 3B1.2(b) (two-level decrease "[i]f the defendant was a minor participant"). The evidence showed that soon after joining the organization, Brooks was promoted from lookout to seller, *see* J.A. at 298–300, 349–50, a central position in a drug distribution conspiracy. The district court did not clearly err in concluding that as a seller—if not as a lookout—Brooks was not occupying a "minor" role entitling him to a decrease in offense level.

■ Brooks' final claim is that the district court erred in increasing his offense level for obstruction of justice. *See* U.S.S.G. § 3C1.1 (two level increase for willfully obstructing administration of justice). During Brooks' sentencing hearing, the district court had before it both Brooks' presentence report and independent testi-mony about Brooks from a Deputy United States Marshal. Brooks' presentence report recited that while in custody on August 8, 1990, five days before trial began, Brooks told Harvis Patterson, a coconspirator and witness for the Government, that if Patterson "rolled over" on him, he would kill him, and that if he could not kill Patterson, he would kill Patterson's family. J.A. at 1081. This information was provided to the probation officer by the AUSA, who had been told of the incident by Patterson. *Id.* at 965. The Deputy Marshal testified during Brooks' sentencing hearing that a day later, on August 9, 1990, he overheard Brooks make a threatening comment directed toward Patterson to a third party. *Id.* at 959–62. There is no suggestion in the record, however, that Patterson either heard or was ever informed of this threatening comment.

The district court appeared prepared to base Brooks' obstruction of justice enhancement at least in part on the information in the presentence report. *See id.* at 965–66. Ultimately, however, the court based Brooks' enhancement solely on the comment as to which the Deputy Marshal had testified. *See id.* at 984 ("As to the two-level increase for obstruction of justice, we have heard the Deputy United States Marshal, who overheard the conversation, testify unequivocally that it was Michael Denard Brooks' voice. Therefore, I have no difficulty in concluding that he is to receive a two-level increase for the obstruction of justice.").

■ We do not believe that the comment as to which the Deputy Marshal testified, standing alone, can support an enhancement for obstruction of justice under section 3C1.1. Under that provision, an increase for obstruction of justice is justified when, *inter alia*, a convicted defendant "threaten[s], intimidat[es], or otherwise unlawfully influence[s] a co-defendant, witness, or juror, directly or indirectly, or attempt[s] to do so." U.S.S.G. § 3C1.1 comment. (n. 3). At a minimum, section 3C1.1 requires that the defendant either threaten the codefendant, witness, or juror in his or her presence or issue the

threat in circumstances in which there is some likelihood that the codefendant, witness, or juror will learn of the threat. Not only is there no evidence in this record that Patterson ever learned of Brooks' threat, there is no basis for concluding from the circumstances in which the threat was made that Patterson might learn of the threat. It is not even clear that Brooks actually intended that Patterson learn of the threat. On this record, we are constrained to vacate Brooks' sentence and remand to the district court for resentencing.

■ On remand, of course, the district court is free to consider again whether to increase Brooks' sentence based upon the comment described in the presentence report. Where, as here, however, a defendant challenges the accuracy of a presentence report, the district court is required to make a finding as to each objection—either independently or by adoption of the recommended finding in the presentence report—before relying on the report in sentencing the defendant. Fed.R.Crim.P. 32(c)(3)(D); *United States v. Morgan*, 942 F.2d 243, 245 (4th Cir.1991).

### B.

Peay's first claim, which she supports with two alternative arguments, is that she cannot be held accountable for the twenty kilograms of cocaine Williamson sought to purchase from undercover agents. Peay first contends that Williamson did not have the wherewithal to make the purchase, and thus that he was "not reasonably capable" of purchasing the cocaine within the meaning of section 2D1.4 of the Sentencing Guidelines. Appellants' Br. at 33–35 (citing U.S.S.G. § 2D1.4, comment. (n. 1), which states in relevant part that "where the court finds that the defendant did not intend to produce and was not reasonably

capable of producing the negotiated amount, the court shall exclude [that amount] from the guideline calculation").

Second, Peay argues that even if Williamson was "reasonably capable" of purchasing the cocaine, the Government did not establish by a preponderance of the evidence a nexus between Peay and the twenty kilograms that Williamson was planning to purchase. *Id.* at 36 (citing U.S.S.G. § 1B1.3, comment. (n. 1), which states in relevant part that "[w]here it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level"). Williamson, according to Peay, supplied cocaine not only to members of the organization of which she was a part, but also to people who had no connection with that organization. She argues that there was no proof that all of the cocaine that Williamson sought to purchase was earmarked for her organization. We reject both of Peay's arguments, and therefore her claim.

■ As to Peay's first argument, there is a threshold question of whether application note 1 to section 2D1.4 of the Guidelines even applies to a defendant's purchase of drugs. That application note provides instructions for calculating the amount of drugs for which a defendant convicted of drug conspiracy or attempt to commit a drug offense will be held responsible at sentencing. The portion of the note at issue in this case requires the court to exclude from its calculation any amount that the defendant "did not intend to *produce* and was not reasonably capable of *producing*." U.S.S.G. § 2D1.4, comment. (n. 1) (emphasis added).[9] Because the note

---

**9.** In relevant part, the note reads as follows: If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. *However, where the court finds that the defendant did not intend to produce and was not reasonably*

*capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.*

U.S.S.G. § 2D1.4, comment. (n. 1) (emphasis added).

focuses on the defendant's intent and ability to produce drugs, it might be thought to apply only to drug *sales* and not to drug *purchases,* such as the one that Williamson negotiated.

We conclude, however, that the application note does apply to purchases as well as sales. The note speaks of *"traffic* in a controlled substance," *id.* (emphasis added), a term sufficiently broad to encompass both the purchase and sale of controlled substances. Other courts that have addressed the question have come to the same conclusion. *See United States v. Brown,* 946 F.2d 58, 60 n. 3 (8th Cir.1991) ("[E]ven though Application Note 1 to § 2D1.4 contemplated the defendant as the seller of drugs, the section [i]s also applicable if the defendant was the buyer and the government the seller."); *United States v. Adames,* 901 F.2d 11, 12 (2d Cir.1990) (application note applies to "reverse transactions, where undercover agents sell instead of buy").[10] Having concluded that application note 1 applies to Williamson's negotiation with the undercover agents for the purchase of the twenty kilograms of cocaine, we proceed to consider Peay's argument on the substantive application of the note.

Peay contends that she cannot be held responsible for these twenty kilograms because Williamson did not have sufficient cash to consummate the transaction. *See* J.A. at 647. To maintain her position, she must argue—as she did repeatedly before the district court prior to

sentencing, *id.* at 887, 889—that under application note 1 the court must exclude from the sentence calculation any amount of drugs the purchase of which was negotiated but not consummated, if the defendant lacked the intent *or* the ability to complete the transaction for the negotiated amount. This argument, however, is based upon a misreading of the application note. The note is framed in the conjunctive, not, as Peay contends, in the disjunctive. The court is required to exclude an unsuccessfully negotiated amount only where the defendant lacked both the intent *and* the ability to complete the drug transaction. *See United States v. Palmer,* 761 F.Supp. 697, 705 (D.Idaho 1991).[11]

It is clear from the record that the district court determined that Williamson had the intent to purchase the twenty kilograms of cocaine. J.A. at 888–91. It is not entirely clear whether the court also determined that Williamson had the ability to complete the purchase. There is ample evidence in the record, however, to support findings that Williamson had both the intent and the ability. Williamson repeatedly and explicitly told the undercover agents during the course of the extended negotiations that he intended to purchase the twenty kilograms of cocaine. *See, e.g., id.* at 592, 646. Peay does not even dispute that Williamson intended to purchase the cocaine. *See id.* at 891. As for ability, although Williamson did not have, in cash, the $300,000 necessary to complete the deal, *see id.* at 647, 680, he apparently owned various properties collectively worth

---

**10.** As a would-be purchaser of a large amount of drugs for resale, Williamson would be subject to the requirements of the application note even if it related only to sales of drugs, because a would-be purchaser who is unable to purchase a large amount of drugs is necessarily unable to produce (for resale) the drugs that he sought to purchase.

**11.** The rule is frequently misstated by the courts. *See, e.g., United States v. Ruiz,* 932 F.2d 1174, 1183–84 (7th Cir.) (drug amount should be included if defendant "intended to produce and was 'reasonably capable of producing'" drugs), *cert. denied,* —— U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991); *United States v. Bradley,*

917 F.2d 601, 604 (1st Cir.1990) (drug amount should be included if defendant "fully intended to produce, and was reasonably capable of producing," drugs); *United States v. Buggs,* 904 F.2d 1070, 1079 (7th Cir.1990) (drug amounts should be excluded if defendant "did not intend to or could not produce those amounts"). *But see United States v. Jacobo,* 934 F.2d 411, 416 (2d Cir.1991) (drug amount should be excluded if defendant "lacked the intent and ability to deal in the negotiated amount"); *United States v. Estrada–Molina,* 931 F.2d 964, 966 (1st Cir.1991) (drug amount should be excluded if defendant "neither intended to produce nor was capable of producing the disputed amount").

in excess of $300,000, which he offered to pledge as collateral to support his purchase of the drugs on credit, *id.* at 647–50.

 With respect to Peay's second argument, there is, as she notes, evidence in the record that Williamson represented himself to the undercover agents as a wholesaler for several different individuals, some of whom did not live in North Carolina. *Id.* at 627, 634, 663, 698. But the record also contains evidence that Williamson, if not a *de facto* member of the drug organization, at least had close ties to the organization. For example, during the course of his negotiations with the undercover agents, Williamson made repeated references to Peay's husband, Benjamin Peay, who was the leader of the drug operation, and even identified Benjamin Peay as a business associate. *Id.* at 60203, 606, 662. The record also reflects that Williamson at one point took the two agents to meet Benjamin Peay at a club that Williamson and Mr. Peay co-owned. *Id.* at 606.

The district court concluded that there was sufficient evidence linking the twenty kilograms of cocaine for which Williamson was negotiating with the conspiracy of which Peay was a part. *See id.* at 895 (court found that "the evidence was abundantly clear that [Benjamin] Peay and Williamson were in the drug business together and, in reality, partners in the drug business according to Williamson's statements made to the officers"). We are unwilling to say that the district court clearly erred in determining that there was a sufficient nexus between the conspiracy and the twenty kilograms of cocaine to permit attribution of this cocaine to Peay for purposes of sentencing. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

 Peay's second claim is that the district court erred in increasing her offense level for having played a managerial or supervisory role in the offense. *See* U.S.S.G. § 3B1.1(b) (three-level increase "[i]f the defendant was a manager or supervisor ... and the criminal activity involved five or more participants or was otherwise extensive"). At trial, witnesses testified that Peay took employees of the drug operation to work, J.A. at 344–45; that she paid the employees, *id.* at 399; that she picked up money from, and delivered drugs to, the employees, *id.;* that she purchased cocaine when the organization's supply was low, *id.* at 373; and that she effectively ran the operation while her husband was ill, *id.* at 372, 399. This testimony plainly supports the district court's determination that Peay occupied a managerial or supervisory role in the conspiracy.

### CONCLUSION

For the foregoing reasons, we affirm the convictions of all five appellants and appellant Peay's sentence. We vacate appellant Brooks' sentence, and remand to the district court for resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**