67 F.3d 297
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Tyrone Eugene JOHNSON, a/k/a Jap, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kevin Terrell JACKSON, Defendant-Appellant.
 Nos. 94-5088, 94-5099.
 United States Court of Appeals, Fourth Circuit.
 Argued June 7, 1995.
Decided Aug. 31, 1995.
 
 ARGUED: John Joseph Butler, PARKER, POE, ADAMS & BERNSTEIN, Raleigh, NC; Robert Ashley Meynardie, Jonathan Drew Sasser, MOORE & VAN ALLEN, P.L.L.C., Raleigh, NC, for Appellants. John Samuel Bowler, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, NC, for Appellee. ON BRIEF: Janice McKenzie Cole, United States Attorney, Jane H. Jolly, Assistant United States Attorney, Raleigh, NC, for Appellee.
 Before ERVIN, Chief Judge, WILKINS, Circuit Judge, and JACKSON, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 WILKINS, Circuit Judge:
 
 
 1
 Tyrone Eugene Johnson and Kevin Terrell Jackson appeal their convictions and sentences for conspiracy to distribute cocaine base, see 21 U.S.C.A. Sec. 846 (West Supp.1995), and for distribution of cocaine base, see 21 U.S.C.A. Sec. 841(a)(1) (West 1981), alleging numerous errors. For the reasons that follow, we affirm.
 
 I.
 
 2
 During the spring of 1993, law enforcement officers in Jacksonville, North Carolina investigated a conspiracy to distribute cocaine base that was managed by Jackson. To uncover the conspiracy, the officers used a confidential informant, J.C. Lee, III, to make several controlled purchases of cocaine base from members of the group. Most of Lee's conversations during these transactions were recorded. Also, portions of meetings between Lee and the conspirators were observed by police.
 
 
 3
 Lee made a controlled purchase from Jackson on May 4, 1993 and paid Jackson the following day. On June 5th, Lee, while wearing a hidden tape recorder, bought cocaine base from Jackson's cousin, Joe, at the residence of Jackson's girlfriend. Joe met Lee when he arrived, and the two negotiated a price and executed the sale in the kitchen. Lee asked whether he could pay one-half of the purchase price later that evening or the following day. This request presented logistical problems concerning how the remaining payment would be made because Joe, Jackson, and Johnson were planning to leave for Florida. Joe agreed to Lee's request to delay payment and then asked Johnson, who was in the living room, "You want to do it like that?" Johnson, who remained in the living room during the sale but was within hearing distance of Joe and Lee, responded, "You can put it in the Union."[1] Joe, speaking to Lee, then repeated Johnson's statement, saying, "You can put it in the Union." The following day, Lee spoke with Jackson by telephone about the purchase and wired the remainder of the money to Florida in Jackson's name.
 
 
 4
 Thereafter, Lee arranged another purchase from Jackson to be made at a parking lot near Lee's residence on June 14th. Jackson drove to the scene and carried the cocaine base to Lee's automobile while Johnson and Joe waited inside the vehicle.
 
 
 5
 At trial, Lee was the Government's first and primary witness. However, to the Government's surprise, Lee denied ever having purchased cocaine base from Jackson, testifying that he had purchased cocaine base from Joe on all three occasions. Lee claimed that most of his references during the recorded conversations to "K. J."--an alias used by Jackson--were actually to Joe, explaining that Joe was also known as "K. J." He stated that the officers for whom he made the controlled purchases had mistakenly assumed that he was referring to Jackson when he said "K. J." Lee admitted, though, that he had been recorded speaking to Jackson by telephone about at least one drug purchase and that he had previously wired money to Jackson. After Lee was excused as a witness, his testimony was impeached by officers who stated that Lee had told them that he had purchased from Jackson on May 5th and June 14th, not simply from "K. J." The audio tapes from the controlled purchases also were played for the jury, allowing it to hear the voices of Johnson, Jackson, and Joe. And, the jury viewed a video tape that showed the three along with others traveling to Florida soon after the June 5th transaction.
 
 
 6
 The jury subsequently convicted Johnson and Jackson, and, in February 1994, the district court sentenced them to terms of imprisonment of 156 months and 324 months, respectively.
 
 II.
 A.
 
 7
 Johnson challenges the sufficiency of the evidence supporting his convictions. In applying the familiar sufficiency of the evidence standard, we "construe the evidence in the light most favorable to the government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced." United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991). If the jury adopts one reasonable interpretation of the evidence over others, we must uphold that interpretation. See United States v. Garcia, 868 F.2d 114, 116 (4th Cir.), cert. denied, 490 U.S. 1094 (1989).
 
 
 8
 To sustain a conspiracy conviction, "the government must show, first, that a conspiracy existed; then, that the defendant had knowledge of the conspiracy; and finally, that the defendant voluntarily became a part of the conspiracy." United States v. Bell, 954 F.2d 232, 236 (4th Cir.1992), cert. denied, 114 S.Ct. 112 (1993). The jury reasonably could have concluded from listening to the taped conversation among Joe, Lee, and Johnson that Joe sought Johnson's permission to allow Lee to defer payment of one-half of the purchase price of the cocaine base and that Johnson responded with an implicit approval by instructing that the debt be paid by wiring the money. Johnson's response to Joe was sufficient to permit a reasonable jury to conclude that Johnson was aware of the conspiracy and joined in it. Although Johnson insists that the statement, "You can put it in the Union," is not itself enough to indicate his involvement, this statement--taken in the context of the conversation--reasonably could be viewed as showing that he was not only a part of the conspiracy, but was directing his coconspirator's actions. Further, other facts, while not sufficient standing alone to support a guilty verdict, when considered in conjunction with the recorded colloquy, evidenced Johnson's participation. He traveled to Florida with Joe and Jackson soon after the June 5th transaction and was observed two weeks later in the vehicle Jackson was driving during the June 14th controlled purchase. Thus, the evidence was sufficient for a reasonable jury to conclude that Johnson was a member of the conspiracy and, accordingly, for us to affirm the conspiracy conviction.
 
 
 9
 Sufficient evidence was also presented to affirm Johnson's conviction on the substantive distribution count arising out of the June 5th transaction. Section 841(a)(1) provides in pertinent part that it is "unlawful for any person knowingly ... to ... distribute ... a controlled substance." The term "distribute" in this statute is defined "quite broadly to include not only the transfer of physical possession, but also other acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price." United States v. Luster, 896 F.2d 1122, 1127 (8th Cir.1990) (internal quotation marks omitted). The Government need not show that Johnson physically transferred the cocaine base if it can show "other acts in furtherance of the transfer." United States v. Crockett, 813 F.2d 1310, 1316 (4th Cir.), cert. denied, 484 U.S. 834 (1987). No evidence was presented that Johnson personally transferred the cocaine base. However, as discussed above, a reasonable jury could conclude that Johnson's response to Joe constituted a grant of permission to defer payment and instructions on how to complete the transaction.[2] A jury could reasonably view these instructions as an act in furtherance of the transfer, providing sufficient evidence to support the substantive conviction.[3]
 
 B.
 
 10
 For his part, Jackson alleges that the district court erred in permitting the Government to elicit testimony from law enforcement officers who stated that Lee had told them that he had purchased cocaine base from Jackson. He contends that this testimony was extrinsic evidence of prior inconsistent statements, which was inadmissible because the Government failed to afford Lee an opportunity to explain or deny the officers' testimony, see Fed.R.Evid. 613(b),[4] and that this error entitles him to a new trial. We disagree.
 
 
 11
 Because Jackson did not raise this issue before the district court, we review only for plain error. United States v. Olano, 113 S.Ct. 1770, 1776 (1993). To prevail, Jackson must show that (1) an error was committed; (2) the error was plain; and (3) the error affected his substantial rights. Id. at 1777-78. Further, if these threshold requirements are met we must decide whether the error is of a type that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 1779 (internal quotation marks omitted; alteration in original).
 
 
 12
 We need not decide whether the trial court committed error that was plain because Jackson has not demonstrated that the alleged error affected his substantial rights, i.e., that it affected the outcome of the proceedings. See Olano, 113 S.Ct. 1777-78. The Government presented the challenged testimony to impeach Lee's contention that he had purchased cocaine base from Joe rather than from Jackson on the pertinent dates. However, considerable other evidence was presented from which the jury could conclude that when Lee discussed drug transactions with "K. J." he was talking to Jackson rather than to Joe. The jury could definitely distinguish Joe's voice from Jackson's by listening to the various audio tapes and by watching and listening to Joe and Jackson together on the video tape of their trip to Florida. Further, Lee admitted that during at least one of the recorded conversations in which he discussed a drug transaction with "K. J.," he was speaking with Jackson. Therefore, we find no prejudice and reject this argument.
 
 III.
 
 13
 Appellants also raise several allegations of error regarding their sentences. We review the factual determinations of the district court for clear error and its legal conclusions de novo. See United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989).
 
 A.
 
 14
 Johnson claims that the sentencing court erred in failing to find that he was a minimal participant--or at least a minor participant--in the drug activity, thereby entitling him to a reduction in his offense level. See United States Sentencing Commission, Guidelines Manual, Sec. 3B1.2 (Nov.1993). The burden was on Johnson at sentencing to establish by a preponderance of the evidence that he was entitled to a mitigating adjustment. See United States v. Gordon, 895 F.2d 932, 935 (4th Cir.), cert. denied, 498 U.S. 846 (1990). The district court found that Johnson had knowledge and an understanding of the scope of the conspiracy and that he had failed to demonstrate that he was less culpable than the other members. We cannot say that this finding was clearly erroneous. See id. at 934-35 (determination regarding role in the offense is a factual question).
 
 B.
 
 15
 Jackson primarily challenges the quantity of cocaine base attributed to him by the district court. See U.S.S.G. Sec. 2D1.1. The quantity of narcotics for which a defendant is held accountable at sentencing is a factual determination that must be proven only by a preponderance of the evidence and may be an approximation, even a "very rough estimate[ ]." United States v. Uwaeme, 975 F.2d 1016, 1018-19 (4th Cir.1992); see U.S.S.G. Sec. 2D1.1, comment. (n.12). Thus, we accord the district court substantial deference in making this estimate. See United States v. Brooks, 957 F.2d 1138, 1148 (4th Cir.), cert. denied, 112 S.Ct. 3051 (1992).
 
 
 16
 The sentencing court found Jackson responsible for 2,268-2,436.4 grams of cocaine base, 82.5 grams of which were based on the controlled purchases. The remainder was derived from a statement Jackson made to a law enforcement officer, who testified at sentencing that Jackson told him he "first became involved in [cocaine base] distribution in November of 1992" and was supplied with "at least two ounces of [cocaine base] twice a week" between November 1992 and March 1993. Based on Jackson's statement, the presentence report, which the district court adopted, calculated the quantity of cocaine base that Jackson distributed during this period by multiplying 20 weeks by four ounces per week, for a total of 2,268 grams.
 
 
 17
 Jackson claims that the testimony from the officer was too vague, without more precise dates, for the district court to find that he distributed four ounces of cocaine base for each of 20 weeks.[5] Specifically, he argues that between November and March could only reasonably include the period from December 1st to February 28th.
 
 
 18
 We need not decide whether the district court committed clear error in finding that the officer's testimony was sufficient for it to conclude that Jackson distributed four ounces per week for 20 weeks[6] because even if we accepted Jackson's argument that between November and March means that the only proper conclusion that the district court could have reached was that Jackson had distributed four ounces per week during the months of December, January, and February, his offense level and resulting guideline range would be the same.[7] See Williams v. United States, 503 U.S. 193, 202-03 (1992) (sentence is not imposed as a result of an incorrect application of the guidelines, and reviewing court must affirm, when a district court that has not intended to depart selects a sentence within the correct guideline range). Accordingly, we affirm.
 
 
 19
 Jackson additionally maintains that he is entitled to resentencing because the district court violated his Fifth Amendment right against self-incrimination during sentencing. After the officer testified concerning Jackson's distribution between November and March, Jackson, who did not testify at trial, requested that he be allowed to testify for the limited purpose of rebutting the officer's testimony. The Government responded that if Jackson took the stand, cross-examination should be open to "everything." The district court then responded to Jackson's counsel by stating, "I think it may be, too. You can't limit the defendant under any theory I can think of.... I'll be glad to let you help me." Jackson then withdrew his request to testify.
 
 
 20
 We need not decide whether Jackson should have been permitted to testify for a limited purpose during sentencing because, by choosing not to testify, Jackson has failed to preserve this issue for appellate review. In Luce v. United States, 469 U.S. 38 (1984), the Supreme Court held that a defendant who does not ultimately testify cannot challenge on appeal an in limine ruling that would have permitted the Government to impeach his testimony with a prior conviction if he had chosen to testify. The Court reasoned in part that any possible harm from the trial court ruling was "wholly speculative," even assuming that the eventual ruling during trial would have been the same. Id. at 41-42. We are similarly left to speculate here. We do not know the questions Jackson's counsel would have asked; whether the Government's questions, in turn, would have exceeded the scope of direct examination; or how the trial court would have ruled. In short, we can make no meaningful review because Jackson's exact testimony and its context remain "unknowable." Id. at 41; see United States v. Nivica, 887 F.2d 1110, 1115-17 (1st Cir.1989) (applying Luce to in limine ruling of the district court that if defendant testified, cross-examination would not be limited to issues presented on direct examination), cert. denied, 494 U.S. 1005 (1990); see also United States v. Johnson, 903 F.2d 1219, 1222 (9th Cir.) (applying Luce to in limine ruling of the district court that if defendant testified, he would be required to try on or hold up certain clothing), cert. denied, 498 U.S. 985 (1990). We therefore conclude that this issue was not preserved for appellate review.
 
 C.
 
 21
 We finally address two of Appellants' claims that are common to their sentences. First, they assert that the district court did not determine sufficiently whether they had read and discussed their presentence reports. See Fed.R.Crim.P. 32(a)(1)(A). During their respective sentencing hearings, the district court asked Appellants "through counsel" whether they had "receive[d]" a copy of the report. Both attorneys, responding for themselves and their clients, stated, "We did." Although it is a close question, we conclude that this colloquy was sufficient to allow the district court to determine that the requirements of the rule had been satisfied. See United States v. Miller, 849 F.2d 896, 897-98 (4th Cir.1988). However, we emphasize that we are not entirely comfortable with the inquiry by the district court; Appellants should have been asked directly whether they had read and discussed the reports with counsel. See United States v. Lockhart, 58 F.3d 86, 89 (4th Cir.1995).
 
 
 22
 Next, Appellants insist that there is no scientific distinction between cocaine and cocaine base, so that under the rule of lenity, they must be sentenced consistent with the guideline penalties for cocaine rather than cocaine base. They rely primarily on United States v. Davis, 864 F.Supp. 1303 (N.D.Ga.1994), as support for this proposition. We have recently rejected this argument and do so again here. United States v. Fisher, 58 F.3d 96, 98-99 (4th Cir.1995).
 
 IV.
 
 23
 We have considered all of Appellants' remaining claims and find them to be without merit. Accordingly, we affirm their convictions and sentences.
 
 AFFIRMED
 
 
 [1]
 It is undisputed that this statement meant that the money could be wired via Western Union
 
 
 [2]
 In addition to the taped conversation played for the jury, which demonstrated that Johnson gave instructions concerning how the money could be transferred, Lee stated during his trial testimony, "Joe asked [Johnson] if it was all right if I sent some money through the Union.... [Johnson] didn't care. [Johnson] was ready to go to Florida. He agreed. He said, 'Go ahead.' "
 
 
 [3]
 Although Johnson was also charged with aiding and abetting the commission of the June 5th sale, see 18 U.S.C.A. Sec. 2 (West 1969), and the district court charged the jury concerning aiding and abetting, the record does not reflect whether the jury found Johnson guilty of this charge. The judgment indicates only that Johnson was convicted of violating Secs. 846 and 841(a)(1). Further, the Government apparently failed to request a charge under Pinkerton v. United States, 328 U.S. 640 (1946). Therefore, we have no basis on which to determine whether Johnson could be liable under the Pinkerton doctrine. Cf. United States v. Chorman, 910 F.2d 102, 111 (4th Cir.1990) ("Proper application of the Pinkerton theory depends on appropriate instructions to the jury.")
 
 
 [4]
 Rule 613(b) provides in pertinent part, "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."
 
 
 [5]
 Alternatively, Jackson alleges that he cannot be held accountable for any of the cocaine base the district court found he admitted distributing between November and March because it was not "part of the same course of conduct or common scheme or plan" as his convictions. See U.S.S.G. Sec. 1B1.3(a)(2). However, the mere fact that these drugs were alleged to have been sold before Lee made his controlled purchases does not mean they cannot be included toward the total quantity attributable to Jackson as relevant conduct. We therefore reject this claim
 
 
 [6]
 We note that there were more than 21 weeks, rather than 20, in the months November through March; thus, Jackson was not actually held accountable for every week of these months. Additionally, the officer testified that Jackson admitted to receiving "at least" four ounces per week during this period
 
 
 [7]
 Multiplying the 13 weeks in these three months by four ounces per week results in 1,474.2 grams. Adding the 82.5 grams from the controlled purchases that the district court attributed to Jackson, the total is 1,556.7 grams. This quantity of cocaine base is still greater than 1,500 grams--the minimum amount in the Drug Quantity Table for level 38. See U.S.S.G. Sec. 2D1.1. Thus, Jackson's base offense level, and resulting guideline range, would remain the same