974 F.2d 1333
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Sally A. VEGA-PENARETE, Defendant-Appellant.
 No. 91-5902.
 United States Court of Appeals,
Fourth Circuit.
 Argued: July 10, 1992
Decided: September 1, 1992
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern. Malcolm J. Howard, District Judge. (CR-91-17-1-4)
 ARGUED: Rudolph Alexander Ashton, III, Sumrell, Sugg, Carmichael & Ashton, P.A., New Bern, North Carolina, for Appellant.
 Robert Eugene Breckenridge, II, Special Assistant United States Attorney, Office of the Staff Judge Advocate, Camp Lejeune, North Carolina, for Appellee.
 ON BRIEF: Margaret Person Currin, United States Attorney, Raleigh, North Carolina, for Appellee.
 E.D.N.C.
 Affirmed.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Sally A. Vega-Penarete (Sally) stabbed and killed her husband, Jose Vega-Penarete (Jose), on the evening of February 2, 1991, at Camp Lejeune, North Carolina, where Jose was stationed as a United States Marine. Sally was indicted and convicted of second degree murder, in violation of 18 U.S.C. § 1111. She now appeals her conviction and sentence, citing numerous assignments of error. Finding no reversible error, we affirm.
 
 
 2
 * Sally and Jose had a troubled, often violent relationship. Throughout their marriage, which began in May of 1987, they engaged in regular bouts of physical, verbal and emotional abuse. Although Sally was most often the victim of the physical abuse, testimony by friends of the couple indicated that she sometimes slapped and punched Jose, and regularly "attacked his manhood" by calling him a homosexual. Sally periodically complained to military authorities about the violence. This resulted several times in Jose's being moved from married enlisted quarters to military barracks. Jose was also arrested by the local police authorities on several occasions after assaulting Sally.
 
 
 3
 In the spring of 1990, during an argument, Sally wielded a knife and cut Jose. Following that incident, Jose reported to his social worker that on more than one occasion his wife had attempted to stab him.
 
 
 4
 During a spirited argument on the evening of February 2, 1991, in the presence of William Landolt, a family friend, Sally ordered Jose to leave their house. He began to comply by packing his bags and kissing the couple's children goodbye. Before departing, Jose approached Sally in the kitchen and pleaded with her not to force him to leave. As he walked slowly toward Sally, she picked up a knife, raised it to shoulder level, and warned him not to come closer. He continued forward with his arms open, weeping and pleading with her to allow him to stay. As Jose leaned toward her, she plunged the knife into his chest, uttering as he fell, "take that[expletive], now you will leave." The blade nicked Jose's heart, causing him to bleed to death a short time later.
 
 
 5
 As Jose stumbled down the hall bleeding, Sally turned to the sink and washed the blood off of the knife. Soon after, she elicited an agreement from Landolt, the family friend who witnessed the stabbing, not to reveal the circumstances of Jose's death. She pledged that she would share insurance proceeds from Jose's death with Landolt if he would agree not to contradict her story.
 
 
 6
 When officers arrived at the scene, Sally told them that she had come home and found her husband in a pool of blood. Later she told authorities that she was at home when Jose arrived with the fatal wound. She then told investigators that her lover had killed Jose. Finally, she told authorities that she was holding the knife at her waist and that Jose ran into it. At trial she claimed, contrary to testimony by Landolt, that she stabbed Jose in self defense after he slammed her into the kitchen counter and threatened her life.
 
 
 7
 A pathologist performed an autopsy and concluded that Sally had stabbed her husband with significant vigor, since bruising around the wound indicated that her fist, which was holding the knife, slammed into his chest. Another pathologist examined Sally and found no bruises that would support her claim that she was battered by Jose before she stabbed him.
 
 
 8
 Sally was indicted for second degree murder in violation of 18 U.S.C. § 1111. She was convicted of the charge by a jury. Following trial she was sentenced to 168 months' imprisonment, the low end of the applicable sentencing range.
 
 
 9
 This appeal followed.
 
 II
 
 10
 The numerous issues raised on appeal by Sally fall into three general categories: challenges to the district court's evidentiary rulings, challenges to the court's jury instructions, and challenges to the court's calculation of her sentence. We address each in turn.
 
 
 11
 * Sally first argues that the district court wrongly permitted an expert pathologist to offer his opinion on the significance of certain forensic evidence. We review a district court's admission of expert opinion testimony for abuse of discretion. See Persinger v. Norfolk & W. R. Co., 920 F.2d 1185, 1187 (4th Cir. 1990). We find no such abuse of discretion here.
 
 
 12
 Dr. Stephen Sohn, a forensic pathologist, performed an autopsy on Jose's body and testified without objection at trial regarding the exact cause of death, the location and angle of the knife wound, and the probable physical circumstances existing at the time of the infliction of the wound. Sohn also testified, over objection, that, given the lack of defensive wounds on Jose's arms and hands, "the deceased most likely was unaware of the pending attack and as such he was not prepared to fend off the assailant." Joint Appendix at 169. Sally argues that Sohn's testimony as to whether Jose expected the blow violated Rule 702 of the Federal Rules of Evidence, because the testimony was beyond Sohn's expertise as a pathologist. She also argues that the same testimony violated Rule 704(b), because, by implication, it revealed Sohn's opinion on Sally's state of mind at the time of the stabbing, which was an ultimate issue properly reserved for the trier of fact.
 
 
 13
 Sally maintains that Sohn's opinion regarding the significance of the lack of defensive wounds was investigative rather than pathological, in that it required Sohn to draw an inference about Jose's state of mind at the time of the stabbing. Such an investigative inference is, she claims, beyond the ken of a pathologist such as Sohn and thus violates the command of Rule 702 that only "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence" may an expert testify thereto.
 
 
 14
 This assertion simply is not supportable. Dr. Sohn was designated as an expert in the field of forensic pathology by the trial court. The very essence of forensic pathology is investigative, in that it seeks through detailed examination of a decedent's body to reconstruct the cause and manner of death. Clues are provided by the decedent's body, and the pathologist's training and expertise allow him or her to draw conclusions based on those clues. Here, Sohn's opinion testimony related directly to the significance of the forensic evidence he presented. His forensic examination found that Jose's body lacked the "defensive wounds" normally found when a decedent is aware that a blow is imminent. Sohn merely testified, based on this evidence, that his opinion was that Jose was not expecting the blow. There is no basis for Sally's claim that Dr. Sohn, though permitted to testify to the lack of defensive wounds on Jose's body, was forbidden to offer his opinion on the significance of the lack of such wounds. See Fed. R. Evid. 702.
 
 
 15
 Sally also argues that by offering his opinion on Jose's state of mind, Dr. Sohn in effect offered an opinion on Sally's state of mind, which, in a trial for murder, is an ultimate issue reserved for the trier of fact. She contends that Sohn's testimony thus violates the dictate of Rule 704(b) that "no expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." We find no merit in this argument. We disagree with Sally's assertion that Dr. Sohn, by offering his opinion as to Jose's state of mind, was in fact testifying to Sally's state of mind. We therefore reject Sally's assertion that Sohn impermissibly testified as to an ultimate issue.
 
 
 16
 Next Sally challenges the district court's admission of testimony by David Martinez, Sally's former lover, and Ron Gillenberg, a bouncer at a nightclub that Sally frequented. She contends that their testimony constituted irrelevant and prejudicial extrinsic acts evidence, offered by the government, in violation of Rule 404(b) of the Federal Rules of Evidence, only to portray her as a bad person, prone to adultery and violence. On appeal, a district court's admission of extrinsic act evidence may only be overturned for an abuse of discretion. See United States v. Mark, 943 F.2d 444, 447 (4th Cir. 1991).
 
 
 17
 Sally and Martinez became lovers for several months while Sally and Jose were separated. The relationship between Sally and Martinez ended approximately one month before the stabbing. At trial, Martinez testified, among other things, about his knowledge that on another occasion Sally had cut Jose with a knife, and about conversations he had with Sally in which she discussed killing Jose.
 
 Rule 404(b) states in relevant part that:
 
 18
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent....
 
 
 19
 Fed. R. Evid. 404(b). This court has interpreted this rule as one of inclusion rather than exclusion, such that evidence of prior bad acts may be introduced under Rule 404(b), so long as it is relevant to an issue other than character, is necessary, and is reliable. See United States v. Rawle, 845 F.2d 1244 (4th Cir. 1988). Martinez's testimony regarding Sally's professed desire to kill her husband constituted direct, powerful testimonial evidence bearing on Sally's mental state at the time of the instant stabbing. Such testimony had no connection to prior bad acts, and thus does not implicate Rule 404 in any way. Martinez's testimony regarding his knowledge of Sally's earlier use of a knife against Jose was probative of her intent to kill Jose, rebutting her contention that the stabbing was in self defense. Because Martinez's testimony was probative of Sally's intent, it should not be excluded as impermissible prior acts evidence. See Fed. R. Evid. 404(b). We therefore reject Sally's contention that testimony by Martinez was wrongly admitted by the district court.
 
 
 20
 The testimony by the bouncer, Gillenberg, is more problematic. Gillenberg testified that Sally was often aggressive in the nightclub, that on several occasions she was involved in fights, and that he had been forced to eject her from the nightclub after disturbances. Sally contends that all of Gillenberg's testimony was impermissible, prejudicial evidence introduced by the government in violation of Rule 404(b) only to portray her as a bad person, prone to violence.
 
 
 21
 The government does not seek to justify the admission of Gillenberg's testimony under an exception to Rule 404(b). Instead, the government contends that the entire gist of Sally's case was to portray herself as a helpless and passive victim of Jose's violence, and that by so arguing, she put in evidence her general character for peacefulness. Therefore, the government argues, it was entitled under Fed. R. Evid. 404(a) to rebut, with testimony by Gillenberg, her claim that she was a docile victim.
 
 
 22
 The government is correct that Rule 404(a) of the Federal Rules of Evidence permits the prosecution to rebut character evidence offered by the accused. The Rule states in relevant part that:
 
 
 23
 Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: (1) Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same ....
 
 
 24
 Fed. R. Evid. 404(a) (emphasis added). However, there are two weaknesses in the government's argument. First, the government fails to support its contention that Sally actually did place in evidence her general character for peacefulness. If Sally had argued that she acted in self-defense on the night of the stabbing because she invariably acted peacefully, and then proceeded to offer evidence on her reputation for peacefulness, then the government would have been entitled under Rule 404(a) to offer negative character evidence to rebut Sally's positive character evidence. See United States v. Benton, 852 F.2d 1456, 1469 (6th Cir. 1988). But this was not what Sally argued. She called no character witnesses, and, in her own testimony, referred to Jose's past acts of violence toward her only to support her contention that, at the moment she stabbed him, she was in reasonable apprehension of grievous bodily harm. Because Sally did not put her character for peacefulness at issue, the government was not entitled to offer evidence tending to prove her violent character.
 
 
 25
 Even assuming Sally had put her character for peacefulness in evidence, the government failed to comply with limits on the nature of negative character evidence that may be offered in rebuttal. Rule 405 of the Federal Rules of Evidence, which governs the presentation of character evidence, states in relevant part that:
 
 
 26
 (a) In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
 
 
 27
 Fed. R. Evid. 404(a). Thus, even assuming the government was entitled under Rule 404(a) to introduce negative character evidence to rebut positive character evidence offered by Sally, the government was required to offer that rebuttal character evidence in the form of reputation or opinion, not specific instances of past conduct.
 
 
 28
 Sally alluded during her testimony to various beatings she had suffered at the hands of Jose. The government cross-examined her, and, taking advantage of the last sentence of Rule 405(a), see supra, questioned her regarding specific instances of her past conduct. During this cross-examination the government had its chance to discredit Sally's testimony, and nothing in Rule 405 gave the government further license to offer rebuttal witnesses to testify regarding past examples of Sally's violent behavior. We therefore find that it was error for the district court to permit introduction of Gillenberg's testimony.
 
 
 29
 We are not convinced, however, that the district court's wrongful admission of Gillenberg's testimony constitutes reversible error. While his testimony did address a central issue of the case-whether Sally acted in self defense-Gillenberg was only a minor witness at trial. He was one of thirty-two witnesses to testify, including William Landolt, the family friend who witnessed the entire incident, and her lover, Martinez, who told the jury that she earlier had discussed killing Jose. In light of the overwhelming evidence tending to discredit her claim of self-defense, we do not believe that the jury's verdict would have been different in the absence of Gillenberg's testimony regarding her behavior in the nightclub. See United States v. King, 879 F.2d 137, 139 (4th Cir. 1989). We therefore hold that although the district court abused its discretion by admitting Gillenberg's testimony, the error was harmless.*
 
 B
 
 30
 Sally objects to several aspects of the district court's jury instructions.
 
 
 31
 First, Sally claims that the court improperly refused to instruct the jury on the defense of accident. She argues, correctly, that a defendant is entitled to an instruction whenever her theory is an accurate statement of the law and has a foundation in the evidence. See United States v. Dornhofer, 859 F.2d 1195, 1198 (4th Cir. 1988). Here, however, Sally can point to no evidence on the record to support a theory that the killing was accidental. Sally herself indicated at trial that she "swung the knife" at Jose, resulting in the fatal wound. She never argued the defense of accident at trial, and the district court properly denied her request for a jury instruction.
 
 
 32
 Second, Sally contends that the district court violated her right to due process by instructing the jury on her claim of self-defense in a way that impermissibly shifted the burden of persuasion to her. In evaluating the adequacy of jury instructions, a particular instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 147 (1973).
 
 
 33
 Here, the court's instruction on the defense of self-defense was treated as a part of its instruction on second degree murder. The court began by offering the following charge on second degree murder:
 
 
 34
 For you to find the defendant guilty of this crime, you must be convinced that the Government has proved each of the following two elements beyond a reasonable doubt: First, that the defendant was killed ... without legal justification; [a]nd second, that the defendant killed Jose ... with malice aforethought.
 
 
 35
 Joint Appendix at 463. The judge then defined malice aforethought, and explained again that the government bore the burden of proving that culpable mental state beyond a reasonable doubt. Finally, as the last part of its instruction on second degree murder, the court informed the jury that if they determined that Sally acted in selfdefense, they should find her not guilty. The court gave an exhaustive, accurate description of self-defense, but did not explicitly state that the burden of disproving self-defense lay with the government. Over counsel's objection, the court declined to restate the burden of proof applicable to a claim of self-defense, apparently relying on the fact that at several points during the instruction on second degree murder the court had noted specifically that the government bore the burden of proving that the killing was without justification.
 
 
 36
 Based on our review of the record, we find that, read in their entirety, the district court's instructions unambiguously placed upon the government the burden of disproving Sally's claim of selfdefense. In instructing the jury on second degree murder the court repeatedly emphasized that the government bore the burden of proving that Sally had killed Jose without legal justification, and that "the law does not require a defendant to prove her innocence or produce any evidence at all." Joint Appendix at 458. We therefore find that the district court did not abuse its discretion by refusing to reinstruct the jury on the burden of proof for Sally's claim of self-defense.
 
 
 37
 Finally, Sally contends that the district court abused its discretion when it attempted to clarify, at the jury's behest, the term "callous and wanton." In essence, she claims that the court's attempt to clarify that term had the unintended effect of blurring the line between second degree murder, with which Sally was charged, and manslaughter, a lesser included offense.
 
 
 38
 In the course of instructing the jury, the court correctly defined second degree murder as killing with malice aforethought. The court also correctly defined malice aforethought as "an intent at the time of the killing willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life." Joint Appendix at 464. The court then explained that manslaughter was a lesser included offense, defined manslaughter as "the unlawful killing of a human being without malice ..., " Joint Appendix at 455, and divided manslaughter into voluntary and involuntary, explaining that voluntary manslaughter was a"heat of passion" killing, while involuntary manslaughter existed where "the defendant's act either was by its nature dangerous to human life or was done with reckless disregard for human life.... " Joint Appendix at 468. No objection was made to these instructions.
 
 
 39
 Following some deliberation, the jury sent a note to the trial judge requesting further explanation of "an intent willfully to act in callous and wanton disregard of the consequences to human life." After considering the jury's request and consulting with the attorneys, the court offered further definition, including a definition of "wanton" taken from Black's Law Dictionary: "reckless; heedless; malicious; extreme reckless disregard; perseverance exhibited by deliberate and uncalled for conduct; an unjustifiable course of action." Sally's counsel objected to the use of the word "reckless" in the definition of wanton, claiming it would blur the distinction in the jurors' minds between second degree murder and involuntary manslaughter, and would convey to them that they could convict Sally of murder even if they found that Sally's actions were merely reckless. The court declined to alter its reinstruction.
 
 
 40
 We find no error in the district court's definition of "callous and wanton." There undoubtedly is an inherently fine line that separates murder from manslaughter. See United States v. Fleming, 739 F.2d 945, 948-49 (4th Cir. 1984). Here, taken as a whole the district court's instructions adequately differentiated the two separate crimes. In combination, the court's instruction and reinstruction made amply clear that to convict Sally of murder the jury had to find that the killing was performed with a particular, willful mental state, while involuntary manslaughter required only a finding of objectively reckless behavior. We therefore hold that the district court did not abuse its discretion when it reinstructed the jury on the terms "callous and wanton."
 
 C
 
 41
 Sally raises several challenges to the calculation of her sentence under the Federal Sentencing Guidelines.
 
 
 42
 First, Sally contends that the court erred by enhancing her sentence by two levels, pursuant to U.S.S.G. § 3C1.1, for obstruction of justice. The essence of her complaint is that, although she destroyed evidence by washing her husband's blood off the murder weapon, although she gave the police no fewer than five versions of what transpired, and although she suborned perjury by attempting to induce a witness to cover up her involvement in the stabbing, she should not be held accountable at sentencing for these actions because she was hysterical and did not realize what she was saying. The judge examined her contention and rejected it as a matter of fact. The district court was well within its discretion to discredit her testimony and impose a sentence enhancement for obstruction. See U.S.S.G.s 3C1.1, comment. (n.3), and we will not second guess that determination on appeal. See United States v. Brooks, 957 F.2d 1138, 1148 (4th Cir. 1992).
 
 
 43
 Next Sally argues that the district court erred in refusing to credit her with acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, where, before trial, she offered to plead guilty to involuntary manslaughter, and, during trial, to voluntary manslaughter. We disagree.
 
 
 44
 Acceptance of responsibility for some elements of the crime charged, but not others, is insufficient to warrant application of the acceptance of responsibility reduction. United States v. Gordon, 895 F.2d 932, 936 (4th Cir. 1990). Here, Sally did not accept responsibility for the malice of her actions, malice that a jury found to be present. Acceptance of responsibility is a factual determination for the district court, reviewable under the clearly erroneous standard, United States v. Curtis, 934 F.2d 553 (4th Cir. 1991), and nothing on the record indicates that the district court erred in finding that Sally refused to accept responsibility for murdering her husband.
 
 
 45
 Finally, Sally contends that the district court should have departed downward from the applicable guideline range based on the conduct of the victim, and the coercion and duress that he perpetrated upon her before the stabbing. She also contends that a downward departure was warranted for her diminished capacity, where the record showed that she has an I.Q. of 76 and writes at a second grade level.
 
 
 46
 A trial court's decision not to depart downward from a defendant's sentencing range is not reviewable unless it is based on the court's mistaken belief that it lacks the authority to depart. See United States v. Bayerle, 898 F.2d 28, 30-31 (4th Cir. 1990). The record clearly reflects that the district court examined Sally's arguments regarding duress and the conduct of the victim, and refused to depart based on the merits of her claim. Accordingly, we will not review the district court's determination.
 
 
 47
 With regard to Sally's diminished capacity argument, U.S.S.G. § 5K2.13, p.s., provides that the sentencing court may downwardly depart if a defendant has committed "a non-violent offense while suffering from significantly reduced mental capacity." (emphasis added). The clear negative implication of this language is that a court may not depart on the basis of reduced capacity if defendant has committed a violent offense. See United States v. Poff, 926 F.2d 588 (7th Cir. 1991) (en banc); United States v. Russell, 917 F.2d 512, 517 (11th Cir. 1990). We therefore conclude that the district court properly found that it lacked discretion to depart downward on the basis of Sally's allegedly reduced capacity.
 
 III
 
 48
 Finding no reversible error in the holding of the district court, we affirm.
 
 AFFIRMED
 
 
 *
 Sally also argues that the district court erred by not granting her motion for acquittal, or alternatively a new trial, on grounds of insufficiency of the evidence. In reviewing the sufficiency of evidence, this court will ask whether "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). Here, Sally admitted to stabbing Jose and argued exclusively that it was an act of self-defense. As the foregoing discussion of the evidence reveals, it was well within the province of the jury to disbelieve Sally's testimony and find that her act was an unprovoked murder